Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
06/30/2017 09:11 AM CDT

GREG STEWART ET AL., APPELLEES, v. DAVE HEINEMAN,
IN HIS OFFICIAL CAPACITY AS GOVERNOR OF
NEBRASKA, ET AL., APPELLANTS.

___ N.W.2d ___

Filed April 7, 2017.    No. S-16-018.

1. **Summary Judgment: Appeal and Error.** In reviewing a summary judgment, an appellate court views the evidence in the light most favorable to the party against whom the judgment was granted, and gives that party the benefit of all reasonable inferences deducible from the evidence.

2. **Attorney Fees: Appeal and Error.** When attorney fees are authorized, the trial court exercises its discretion in setting the amount of the fee, which ruling an appellate court will not disturb on appeal unless the court abused its discretion.

3. **Summary Judgment.** In the summary judgment context, a fact is material only if it would affect the outcome of the case.

4. **Justiciable Issues.** A justiciable issue requires a present, substantial controversy between parties having adverse legal interests susceptible to immediate resolution and capable of present judicial enforcement.

5. **Courts: Justiciable Issues.** A court decides real controversies and determines rights actually controverted, and does not address or dispose of abstract questions or issues that might arise in a hypothetical or fictitious situation or setting.

6. **Justiciable Issues: Standing.** Standing is a key function in determining whether a justiciable controversy exists.

7. **Standing: Jurisdiction.** Standing requires that a litigant have such a personal stake in the outcome of a controversy as to warrant invocation of a court's jurisdiction and justify the exercise of the court's remedial powers on the litigant's behalf.

8. **Actions: Justiciable Issues: Standing.** The ripeness doctrine is rooted in the same general policies of justiciability as standing and mootness. As compared to standing, ripeness assumes that an asserted injury is

sufficient to support standing, but asks whether the injury is too contingent or remote to support present adjudication.

9. **Actions: Jurisdiction.** An appellate court uses a two-part inquiry to determine ripeness: (1) the jurisdictional question of the fitness of the issues for judicial decision and (2) the prudential question concerning the hardship to the parties of withholding court consideration.

10. **Declaratory Judgments.** The function of a declaratory judgment is to determine justiciable controversies which either are not yet ripe for adjudication by conventional forms of remedy or, for other reasons, are not conveniently amenable to the usual remedies.

11. **Equal Protection: Discrimination.** The injury in an equal protection case is the imposition of a barrier that makes it more difficult for members of one group to obtain a benefit, rather than the ultimate inability to obtain the benefit.

12. **Discrimination.** When the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, a member of the former group seeking to challenge the barrier need only demonstrate that he or she is ready and able to perform and that a discriminatory policy prevents him or her from doing so on an equal basis.

13. **Discrimination: Standing.** For those persons who are personally subject to discriminatory treatment, stigmatizing injury caused by discrimination is a serious noneconomic injury that is sufficient to support standing.

14. **Standing.** Standing does not require exercises in futility.

15. **Actions: Moot Question.** An action becomes moot when the issues initially presented in the proceedings no longer exist or the parties lack a legally cognizable interest in the outcome of the action.

16. **Discrimination: Declaratory Judgments: Injunction: Proof.** If a discriminatory policy is openly declared, then it is unnecessary for a plaintiff to demonstrate it is followed in order to obtain injunctive or declaratory relief.

17. **Actions: Moot Question.** A defendant cannot automatically moot a case simply by ending its unlawful conduct once sued.

18. **Actions: Moot Question: Proof.** A defendant claiming that its voluntary compliance moots a case bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur.

19. **Appeal and Error.** A court's consideration of a cause on appeal is limited to errors assigned and discussed.

20. **Attorney Fees: Appeal and Error.** On appeal, a trial court's decision awarding or denying attorney fees will be upheld absent an abuse of discretion.

Appeal from the District Court for Lancaster County: John A. Colborn, Judge. Affirmed.

Douglas J. Peterson, Attorney General, James D. Smith, Ryan S. Post, and Jessica M. Forch for appellants.

Amy A. Miller, of ACLU Nebraska Foundation, Inc., Leslie Cooper, of ACLU Foundation, Inc., and Garrard R. Beeney and W. Rudolph Kleysteuber, of Sullivan & Cromwell, L.L.P., for appellees.

Robert McEwen and Sarah Helvey, of Nebraska Appleseed Center for Law in the Public Interest, for amicus curiae Nebraska Appleseed Center for Law in the Public Interest.

Daniel S. Volchok and Kevin M. Lamb, of Wilmer, Cutler, Pickering, Hale & Dorr, L.L.P., and Robert F. Bartle, of Bartle & Geier Law Firm, for amici curiae Child Welfare League of America et al.

Heavican, C.J., Wright, Miller-Lerman, Cassel, Stacy, Kelch, and Funke, JJ.

Wright, J.

## I. NATURE OF CASE

The plaintiffs, three same-sex couples, sought, pursuant to 42 U.S.C. § 1983 (2012), to enjoin the defendants, Dave Heineman, the former Governor of the State of Nebraska; Kerry Winterer, in his official capacity as the chief executive officer of the Department of Health and Human Services (DHHS); and Thomas Pristow, in his official capacity as the director of the Division of Children and Family Services, from enforcing a 1995 administrative memorandum and from restricting gay and lesbian individuals and couples from being considered or selected as foster or adoptive parents. The court ordered the memorandum rescinded and stricken and enjoined the defendants and those acting in concert with them from enforcing the memorandum and/or applying a categorical ban

to gay and lesbian individuals and couples seeking to be licensed as foster care parents or to adopt a state ward. The court further ordered the defendants and those acting in concert to "refrain from adopting or applying policies, procedures, or review processes that treat gay and lesbian individuals and couples differently from similarly situated heterosexual individuals and couples when evaluating foster care or adoption applicants under the 'best interests of the child' standard set forth in DHHS' regulations." The court awarded the plaintiffs costs and attorney fees.

The defendants appeal. They do not assert that it is constitutional to discriminate on the basis of sexual orientation in the licensing or placement of state wards in foster care. Instead, the defendants argue that the plaintiffs lack standing because they have not yet applied for and been rejected in obtaining a foster care license or in having a state ward placed in their homes. Alternatively, the defendants argue that there was no case and controversy, because the memorandum that was the focus of the plaintiffs' complaint ceased to be the policy of DHHS by the time this lawsuit was filed, despite the fact that the memorandum was never rescinded and it remained on the DHHS website. Finally, the defendants claim that the plaintiffs' lawsuit became moot when the policy memorandum was removed from the DHHS website 3 weeks after the plaintiffs' motion for summary judgment was filed.

## II. BACKGROUND

### 1. Complaint

The complaint, filed on August 27, 2013, centered on an administrative memorandum (Memo 1-95) issued in 1995 by the then Department of Social Services, which subsequently became DHHS in 1996. Memo 1-95 was written by the director of the department and states in relevant part:

It is my decision that effective immediately, it is the policy of the Department of Social Services that children will not be placed in the homes of persons who identify

themselves as homosexuals. This policy also applies to the area of foster home licensure in that, effective immediately, no foster home license shall be issued to persons who identify themselves as homosexuals.

A similar policy was set forth in Memo 1-95 regarding unmarried heterosexual couples. An addendum to Memo 1-95 directed staff not to specifically ask about an individual's sexual orientation or marital status beyond those inquiries already included in the licensing application and home study. The stated reason for the policy was this State's intent to place children in the most "family-like setting" when out-of-home care is necessary. Though Memo 1-95 and the addendum stated that staff would be drafting a proposed program and licensing regulation to be brought before a public hearing in a more formal manner, such proceedings apparently never occurred.

The plaintiffs' complaint alleged that Memo 1-95 was still "in effect" as of April 1, 2013. It was not disputed by the defendants that Memo 1-95 had not been "rescinded or replaced."

The complaint alleged that Memo 1-95 set forth a policy prohibiting the Department of Social Services, now DHHS, from issuing foster home licenses to or placing foster children with persons who identify themselves as homosexuals or unrelated, unmarried adults living together. The plaintiffs alleged that this policy also effectively banned homosexuals from adopting children from state custody, because individuals may adopt children from state care only if they have first been licensed as foster parents.

The plaintiffs consist of three homosexual couples who alleged in the complaint that they are able and ready to apply to be foster parents and would do so but for the policy stated in Memo 1-95.

One couple, Greg Stewart and Stillman Stewart, further alleged that they were married in 2008 in California. They alleged they had contacted DHHS in October 2012 to inquire about obtaining a foster home license. Greg and Stillman

alleged they were told by a DHHS representative that they could not obtain a license because same-sex couples are barred from becoming licensed under DHHS policy.

Another couple, Todd Vesely (Todd) and Joel Busch (Joel), alleged that they "began the process of applying" to become foster parents in July 2008. They completed training, a home study, and submitted to background checks. But, in 2010, Todd Reckling, the director of DHHS' Division of Children and Family Services at that time, informed Todd and Joel that it was DHHS' policy to bar licensing unrelated adults living together. In their answer, the defendants admitted that Reckling informed this couple of Memo 1-95.

The plaintiffs generally alleged that the policy expressed in Memo 1-95 violated equal protection and due process under the state and federal Constitutions and violated 42 U.S.C. § 1983 of the Civil Rights Act. They alleged that prospective foster and adoptive parents were being subjected to differential treatment on the basis of their sexual orientation, and they asserted that sexual orientation constituted a suspect class. The plaintiffs asserted that there was no compelling interest, or even a rational basis, justifying such disparate treatment. The plaintiffs asserted that the policy found in Memo 1-95 impermissibly burdened their personal liberty and privacy rights to enter into and maintain intimate personal relationships within their own homes.

The plaintiffs asserted that they had no adequate remedy at law to redress these wrongs, which were of a continuing nature and would cause irreparable harm. They prayed for a declaration that the policy stated in Memo 1-95 is unconstitutional, void, and unenforceable, and an order enjoining the defendants from enforcing Memo 1-95.

In addition, the plaintiffs asked for an order "directing Defendants to evaluate applications of gay and lesbian individuals and couples seeking to serve as foster or adoptive parents consistently with the evaluation process applied to applicants that are not categorically excluded."

Finally, the plaintiffs asked for attorney fees and further relief as the court deemed proper.

The defendants alleged as affirmative defenses that the plaintiffs had failed to state a cause of action and that the defendants had not violated any of the plaintiffs' constitutional, civil, or statutory rights. The defendants did not affirmatively allege that Memo 1-95 was no longer in effect or enforced.

### 2. Motions Below

The defendants moved to dismiss on the grounds that on the face of the complaint, the plaintiffs lacked standing and stated no claim upon which relief could be granted. The court overruled the motion to dismiss.

On the issue of standing, the court relied upon *Gratz v. Bollinger*[1] for the proposition that the injury in fact in an equal protection case is the denial of equal treatment resulting from the imposition of a barrier, not the ultimate inability to obtain the benefit. Under *Gratz*, the plaintiffs need only show they are "'able and ready'" to apply for a benefit should the discriminatory policy that prevents them from doing so be removed.[2] The court concluded that because the plaintiffs alleged they were able and ready to apply for foster care licenses, their complaint sufficiently alleged standing.

On the issue of failure to state a claim, the court first observed that nothing in Nebraska law sets forth a policy prohibiting homosexuals or unmarried couples from fostering or adopting.[3] It then concluded that the allegations of disparate treatment were sufficient to state causes of action under equal protection and due process.

On December 11, 2014, the defendants moved for summary judgment. On January 27, 2015, the plaintiffs filed

---

[1] *Gratz v. Bollinger*, 539 U.S. 244, 123 S. Ct. 2411, 156 L. Ed. 2d 257 (2003).

[2] See *id.*, 539 U.S. at 262.

[3] See Neb. Rev. Stat. §§ 43-101, 43-107, and 43-109 (Reissue 2016).

a cross-motion for summary judgment. On October 16, the plaintiffs moved for attorney fees. The court's orders on these motions are the subject of the current appeal.

### 3. Evidence at Summary Judgment Hearing

In support of their motion for summary judgment, the plaintiffs submitted affidavits in which they generally confirmed the truth of their factual allegations made in the complaint. The plaintiffs expressed their desire to serve as foster parents and "be subject to the same approval process that is applied to heterosexuals and not be subject to any discriminatory approval process based on our sexual orientation." Greg and Stillman clarified they no longer live in Nebraska, but that they still wish to adopt a Nebraska child out of foster care. Numerous exhibits, including the transcripts of the depositions of several DHHS employees, were also entered into evidence.

### (a) Todd Reckling

Reckling was the director of the Division of Children and Family Services of DHHS when Todd and Joel were communicating with DHHS about the then almost 2-year delay in making any licensing or placement decision since Todd and Joel had completed all the necessary training and background checks. A letter written in June 2010, by Reckling to Todd and Joel, was entered into evidence.

Reckling wrote to Todd and Joel that DHHS policy "allows for an exception" which would have to be made in order for either one of them to foster a child, given that they are two unmarried individuals living together. Reckling gave no indication that such an exception would be made in their case. Even if such an exception were made, Reckling explained, a child could not be placed jointly with or adopted jointly by Todd and Joel. Reckling explained that "'second parent adoptions'" were not permitted by a second person who is not married to the first and that Todd and Joel could not marry, because the

Nebraska Constitution states that only marriage between a man and a woman shall be recognized in Nebraska.

### (b) Kerry Winterer

Todd and Joel were subsequently in contact with Winterer, who has been the chief executive officer of DHHS since July 2009. Winterer sent a letter to Todd and Joel's attorney in November 2011, which was also entered into evidence. By that time, Todd and Joel had waited over 3 years to foster a child. In the letter, Winterer repeatedly cited to Memo 1-95. Winterer explicitly stated that "Policy Memorandum # 1-95 is still in force."

But in his deposition taken in July 2014, Winterer deferred to Pristow, the director of the Division of Children and Family Services for DHHS at that time, regarding the precise details of the then-current policy and the reasons for it. He noted that Pristow's practice permitted placement with homosexual applicants as long as their placement was approved by Pristow in his capacity as director.

Winterer testified that he could imagine no reason for this extra layer of review and approval except to ensure there was no bias against persons who identify themselves as homosexual. However, he also noted that because the Nebraska Constitution does not recognize marriage between two persons of the same gender, homosexual couples who have married in another state would be considered as cohabitating, unrelated adults. Winterer then elaborated that there are "stability" concerns in placing children with cohabitating, unrelated adults. Winterer stated that the current regulations do not allow for both adults in a cohabitating, unmarried relationship to hold a joint license and that there can only be one license issued per address.

Winterer testified he did not believe identifying as homosexual was relevant to that person's qualification as a foster or adoptive parent, but that he could envision sexual orientation being a factor in the best interests analysis, in the event

it could cause a problem with the relationship between the biological parent and the foster parent.

Winterer stated that Memo 1-95 was "modified by practice and . . . the policy of the current director." Winterer thought that Memo 1-95 was still used in DHHS training materials. Nevertheless, he believed new employees were "informed about what the current practice is and the current process in terms of dealing with applicants." He was "assuming that [the new practice] has been communicated to [the caseworkers and supervisors in the service areas] through one means or another." He testified that there was no documentation of any new policy or practice.

With regard to the failure to formally rescind Memo 1-95, Winterer said, "I think our attitude would be it's probably unnecessary because policy evolves and is the expression of practice and policy of the director, who is in charge of making policy for the division under which this falls." He also thought it was "probably unnecessary" to rescind Memo 1-95, which "goes back 20 years and was issued by a director of a[n] agency that no longer exists." He did not specifically discuss any possible distinction between "policy" and "practice."

Finally, Winterer explained that there "may be, shall we say, some . . . implications" in formally rescinding Memo 1-95. Winterer stated that rescinding Memo 1-95 "could draw attention on the part of certain individuals in the state of Nebraska to . . . the issue of gay marriage and some other . . . sensitive issues" and that it could increase scrutiny and "complicate our going about doing our business." He elaborated that he was concerned formal rescission of Memo 1-95 could result in elected officials taking actions that would make it difficult for DHHS to place children with homosexual applicants.

### (c) Thomas Pristow

In March 2012, Pristow took over Reckling's position of director of the Division of Children and Family Services for

DHHS, and remained in that position at the time his deposition was taken in September 2014. In his deposition, Pristow indicated that it was his "understanding" that the same licensing restrictions existed for single, cohabitating, unmarried, married, heterosexual, or homosexual applicants, even before he adopted any policies or procedures with regard to homosexual applicants. He was speaking in terms of a single license, however, and not the ability to obtain a joint license. An email from 2012 indicates that legal advisors before Pristow's tenure had opined that Memo 1-95 could not be enforced as to licensing, because the regulations concerning licensing are silent on the sexual orientation of the applicant.

But licensing is different than placement. While a child generally cannot be placed in a nonlicensed home, having a person licensed in a home does not mean a child will be placed there.

Sometime in the summer of 2012, Pristow verbally instructed his service area administrators and his deputy director that homosexual applicants could be considered for foster or adoptive placements. Pristow did not specifically address whether this was a change in "policy" versus a change in "practice," though most of the questions and answers referred to "policy."

Pristow's placement protocol, hereinafter referred to as the "Pristow Procedure," set forth different procedures for homosexual applicants than for heterosexual applicants. When a caseworker recommends a placement in the home of a married, heterosexual couple, that placement is effective if the caseworker's supervisor agrees with the recommendation. But, under the Pristow Procedure, as described by Pristow, if the caseworker recommends a placement in the home of a homosexual couple or individual, then the placement recommendation can only take effect after being approved by the caseworker's supervisor, the service area administrator, and, finally, Pristow himself. Other DHHS employees clarified that as to homosexual applicants under the Pristow Procedure there are actually five layers of placement review: the caseworker,

the caseworker's supervisor, the administrator, the service area administrator, and then the director (Pristow).

According to Pristow, the protocol for an unmarried heterosexual adult living with another adult—or for a married, heterosexual felon—would require only three levels of approval: the caseworker's, the caseworker's supervisor, and the service area administrator's approval to effect the placement recommendation. Other DHHS employees clarified that this would be four levels of approval, as it would include the administrator. Such applicants would not require Pristow's approval.

Pristow explained that there was no category of applicants, other than homosexuals, that required Pristow's personal approval before a caseworker's placement recommendation could be implemented. And Pristow clarified that he did not review denials of placement with homosexual applicants. He only reviewed recommendations for placement.

Pristow testified that there was no reason, with respect to child welfare, that a person who identifies as homosexual, or that unmarried persons living together, should be treated differently than heterosexual, married persons in the licensing or placement of a child in a foster or adoptive home. He said that in his 20 years of experience in children and family services, "gay and lesbian foster parents do just as good on — if not better than regular foster parents, everything being equal." Pristow agreed that there was a consensus in the scientific literature that the outcome for children was not adversely affected by being raised by homosexual persons, and he said that he had no reason to doubt that consensus.

Pristow explained that Nebraska was a conservative state with a constitutional amendment banning gay marriage. He "take[s] that into account when [he] make[s] these type[s] of placements." When asked how he takes that into account, Pristow explained, "I make it my decision and not the field's."

Pristow explained that when reviewing placement recommendations with homosexual applicants, he did not consider the sexual orientation of the recommended foster or adoptive

parent in making his decision. The applicant's sexual orientation was only relevant insofar as it was the triggering factor of the extra layer of review.

But Pristow also indicated that Nebraska's laws and the constitutional amendment regarding homosexual couples were somehow taken into account in his decisonmaking:

> I do work for the State, and I am supportive of its laws and its amendments to the constitution. And I take that in balance when I, you know, make those type[s] of decisions about placing children in gay and lesbian foster homes. . . .
>
>     . . . .
>     . . . [T]his is a conservative state, and I'm cognizant of that, and I want to make sure that I — that my process is — has foundation, and that, again, it reflects what the best interest of that child is . . . .

Pristow, however, denied that he took a "harder look" at placements with homosexual applicants. And he stated that he had no reason to doubt the competency of caseworkers and their supervisors in making best interests decisions. He explained that it is just "a process so that I can take on the responsibility of making that decision from the field so that these placements can be made in accordance with the best interests of the child."

Pristow acknowledged that, as of the time of the deposition in September 2014, Memo 1-95 was still on DHHS' website and that there was nothing in writing on the website or elsewhere disavowing the policies stated in Memo 1-95. To the contrary, it was his understanding that Memo 1-95 was included in the packet of administrative memorandums that was given to new trainees as they enter into the system.

Neither was there anything in writing, to his knowledge, reflecting the Pristow Procedure. But Pristow said that, as new trainees go out into the field, they are supposed to be told of it. Pristow was unsure exactly how thoroughly this was done. He explained:

As the new trainee goes out to the field, either through a mentoring protocol that we have or through [his or her] new supervisor, there is — they are — they begin to learn the practice of how we do child welfare in Nebraska. And as this would come up or when it does come up, they are told of the protocol that I put — the policy that I put in place verbally.

. . . .

. . . I can't speak to whether [a caseworker, when approached for the first time by a homosexual applicant] would know [Memo 1-95 is no longer the current practice]. My instructions were to the service area administrators when I gave my verbal policy out, and my direction was to make sure that it was disseminated throughout the field.

Pristow agreed that there "might be some confusion" for new employees as to whether Memo 1-95 is still DHHS' policy and practice, but he believed "the field is very competent, very competent in making sure that information is disseminated and that we look out for the best interests of the child and we find the best possible placement for that child regardless of gender — or of orientation."

Pristow acknowledged that four new service area administrators had been hired or promoted into that position since the summer of 2012 and that he did not have a specific discussion with those new service area administrators regarding his verbal policy. Pristow said, "The general intent and theme of what I wanted to have happen, though, I'm sure was conveyed through the deputy and in some manner or form as we went through the years."

Pristow testified that it was within his authority to send out a notification to all staff stating that Memo 1-95 no longer represents DHHS policy. He had chosen not to do so. Pristow testified that Memo 1-95 was "still on the website and it's still in play." He explained "it hasn't been rescinded except through verbal instructions by me to my service area administrators."

There was "nothing on the website that would indicate [Memo 1-95 is] no longer policy."

Pristow agreed that a prospective applicant could look at the website and be discouraged by Memo 1-95 from applying to be a foster or adoptive parent. Pristow testified that he deliberately determined to keep Memo 1-95 on the website and in DHHS' training materials, and to have the Pristow Procedure be verbal only. Pristow could think of no instance other than Memo 1-95 wherein DHHS has had an administrative memorandum on its website setting forth a policy that is not, in actuality, DHHS' policy and practice.

(d) Other DHHS Employees

The depositions of two deputy directors at DHHS, a policy administrator, a field operations administrator, and five service area administrators were also entered into evidence for purposes of the summary judgment motions. At the time the depositions were taken, in October and November 2014, Memo 1-95 was still on the DHHS website. Tony Green, a deputy director at DHHS, testified that it is DHHS' general practice to update memorandums as needed and that, typically, a memorandum that no longer represents DHHS policy would be removed from the website. The decision to remove or keep a memorandum from the website would be made by the director and the chief executive officer.

No other employee opined with any certainty as to the standard procedure for memorandums that cease to represent DHHS' policy or procedure. However, a copy of a DHHS web page listed, under the broad category of "Archived Administrative & Policy Memos," the subcategories of "Rescinded Memos" and "Rescinded and Replaced Memos." Memo 1-95 was not listed under either of those categories. The web page set forth that it was last updated on February 6, 2015.

None of the employees deposed were aware of anything in writing on the website or elsewhere, informing staff and potential applicants that Memo 1-95 no longer represented DHHS'

policy or its practice. Neither were any of the employees aware of anything in writing contradicting Memo 1-95 by expressly stating that homosexuals were permitted to serve as foster or adoptive parents.

The employees described Memo 1-95 as still the current "policy," but stated that it did not represent the current "practice." According to these employees, Memo 1-95 had not been "rescinded" or "modified" by the director, thus it was still "in effect," or "active." They all agreed it was not followed, however. The witnesses were unaware of any other instance where DHHS practice was in conflict with an existing policy memorandum.

A field operations administrator for DHHS described the Pristow Procedure as "granting an exception on [an] existing memo." And a document was entered into evidence that had been created in August 2014 by Nathan Busch, a DHHS policy administrator, listing the "Placement Exceptions by Director" from July 2013 to August 2014. Numerous such exceptions listed the "Type of Exception" as "Same-Sex Couple."

The DHHS employees uniformly described the current practice as having five layers of approval for placement of a foster child in the home of same-sex couples or individuals who identify as homosexual. These layers consist of the original recommendation for placement by the caseworker and then approval by the caseworker's supervisor, the administrator, the service area administrator, and, finally, the director. The DHHS employees testified that felons and unmarried, unrelated adults also require extra layers of approval, but only four. Only homosexual applicants required the approval of the director.

According to Kathleen Stolz, a service area administrator, Reckling had required director approval of all placements with unmarried couples. And Stolz stated that "we no longer needed to send for approval for placement in an unmarried, unrelated home to the director unless there was a self-disclosure that they were in a same-sex relationship or were gay or lesbian." The employees believed that under the Pristow Procedure,

sexual orientation was not to be taken into account in a best interests analysis.

The employees testified that during training, new DHHS hires are no longer given a physical copy of Memo 1-95, or of any of the policy memorandums. Instead, trainees are notified of where to locate the administrative memorandums on the website. There was no indication during new employees' classroom training that Memo 1-95 is no longer to be followed.

The employees explained that the Pristow Procedure is instead discussed in the field during mentoring of new caseworkers, as well as through "word-of-mouth" within the service areas. DHHS also holds monthly meetings of service area administrators, and one or two caseworkers or supervisors from each service area attend those meetings. The Pristow Procedure is discussed at these meetings whenever there are new service area administrators.

One DHHS deputy director explained that dissemination of the Pristow Procedure is always verbal, "[b]ecause we have a current policy on the — on the issue."

A service area administrator testified that when asked about the status of Memo 1-95 by DHHS staff, she responds that it is on the website; it is "still an administrative memo, and it's still in effect." She does not explain the Pristow Procedure unless specifically asked about it.

None of the employees deposed could state with certainty that all DHHS employees were aware of the Pristow Procedure. However, none were specifically aware of any current confusion as to the Pristow Procedure within DHHS.

As to dissemination of the current practice to the approximately 40 agencies that DHHS contracts with to provide foster care services, the DHHS employees explained that there are regular meetings with such agencies. There was testimony that the Pristow Procedure was discussed in at least one of those meetings.

But, again, the employees were uncertain whether every contractor knew of the Pristow Procedure. One service area

administrator believed there was still confusion within outside contracting agencies about DHHS policy and practice as concerns placement with homosexual applicants.

The employees agreed that there is a need for more foster parents and that there are no child welfare interests served by excluding homosexual applicants or by requiring extra layers of approval for placements with homosexual licensees. The employees conceded that Memo 1-95 could deter prospective homosexual foster and adoptive parents from pursuing foster care or adoption.

According to the DHHS employees, the approval was generally described as strengthening the placement decision as being in the best interests of the children placed within homes of homosexual foster parents—in the event that a particular placement became an "issue." Busch was unsure exactly what the reason was, but believed Pristow was "referring to the fact that there is a written policy in place that he does not support the practice of."

### (e) Internal Communications

Internal email correspondence from June 28, 2012, to June 4, 2013, was also offered by the plaintiffs and admitted into evidence in support of their motion for summary judgment. The emails were submitted as evidence of the lack of dissemination and clarity surrounding the Pristow Procedure and the continuing validity of Memo 1-95.

In an email dated June 29, 2012, a DHHS employee expressed that he and any contractor needed to follow Memo 1-95 until that policy is changed. And in correspondence with a contracting agency, he explained that the likelihood of placement with a same-sex couple was "small as the adults in that home would need to be the best possible placement for a specific child and [the Division of Children and Family Services] would need to take the request to make the placement all the way to Central Office and get [its] agreement."

In various other emails in the months following the announcement of the Pristow Procedure, employees appeared

to be aware of the Pristow Procedure, but asked for clarification on the details. In July 2012, Marylyn Christenson, a DHHS resource development supervisor, expressed confusion, in light of Memo 1-95, about whether homosexual applicants could be licensed. This communication took place because a contracting agency was also confused. Still, Christenson stated that she knew placement approval for a homosexual applicant would have to be from the director. She opined that "we would need to tell these [homosexual individuals interested in fostering] that [any placement will require director approval] so they know before they go to the trouble to get [licensed]."

In September 2012, a different contracting agency asked for clarification as to whether same-sex couples could foster, given that the "memo from the 90's seems to be in [e]ffect." Pristow personally responded to this email, explaining that DHHS' legal department advised that DHHS cannot deny a license to applicants who meet the regulations, which do not touch upon sexual orientation. But Pristow also explained that licensing "does not guarantee placement as the placement would need my prior approval before the placement could occur."

In October 2012, the employee of yet another contracting agency still believed that neither party of a same-sex couple could be licensed to foster. A DHHS employee told that employee that one member of the same-sex couple could be licensed, but the DHHS employee was unable to answer the agency's questions regarding what factors were involved in the placement decision for a licensed member of a same-sex couple.

In November 2012, Christenson expressed in an email her belief that Memo 1-95 was "still in force since it's on the website." Stolz responded that she thought Memo 1-95 had been removed from the website, but that she would follow up. Christenson responded that she "didn't know an Admin memo could be removed, w/out a replacement, or notice. It's been confusing to follow how they are handling that memo."

When, after discussion with Stolz, the resource developer administrator emailed Christenson that they would be going ahead with licensing one of the applicants who is in a same-sex relationship, Christenson stated that "no one has clearly explained to me how we can license a home when [Memo 1-95] is still in effect." Further emails between Christenson and other employees discussed being unwilling to license homosexual applicants, apparently despite communications from their supervisors to do so. An email to Christenson from a DHHS resource developer explained that she was "not comfortable going against policy" and that others should know that Memo 1-95 "which clarifies the policy has not been rescinded so . . . it is basically against policy [to license homosexual applicants] at this point."

In November 2012, Busch stated to the service area administrators that he had been receiving some inquiries about the status of Memo 1-95. He clarified that Memo 1-95 was "still active and has not been rescinded. An exception to [Memo 1-95] must be granted by Director Pristow."

There was testimony that up until approximately September 2014, Christenson and other staff were placing "holds" on all licensed homes where homosexuals or unmarried couples resided. When a home is on hold, no placements can be made in the home until the hold is lifted. These holds were apparently meant to "trigger the staff to know that they needed to have either service area or director approval prior to the placement to ensure that we were following current practice." After Stolz became aware of the practice of putting these homes on hold, it ceased.

(f) Answers to Interrogatories

In the defendants' answers to interrogatories, they described that it was DHHS' "policy" to allow only one license per address and to allow a joint license only for married couples.

With regard to placements of wards when the foster parent is unmarried and there are other adults living in the home, the defendants explained:

[P]lacement of wards when the foster parent is unmarried and there are other adults living in the home if:
• The ward is related to the foster parent by blood or adoption
• The ward is a former foster child of the foster parent
• The foster parent is the legal guardian of the ward, or
• The foster parent is responsible to provide physical care to and supervision of the ward, whose placement is supervised by a developmental disability agency.

If none of the above criteria are met, DHHS policy also allows for an exception if the local office believes that placement in the home would be appropriate and in the best interest of the child. *If the foster parent has identified as gay or lesbian, the Service Area Administrator would then make a request for approval to the Director of the Division of Children and Family Services. The Director would then make a decision on whether placement in the home would be appropriate and in the best interest of the child. If the placement is approved, the ward will be placed with the licensed or approved individual.*

(Emphasis supplied.) The defendants did not address whether it would recognize same-sex couples as married if they were married in another state.

In a response to an interrogatory asking how DHHS would determine an applicant's sexual orientation, the defendants relied on Memo 1-95 to point out its policy not "'to ask any specific questions about an individual's sexual orientation or marital status than is currently asked in the licensing application, home study, etc.'" The defendants stated that training instructors do not distribute any administrative memorandums during orientation training, but are "expected to review policies on their own."

(g) Memo 1-95 Removed
From Website

The defendants submitted the affidavit of Green, the acting director of the Division of Children and Family Services.

Green obtained that position on January 8, 2015. Green averred that Memo 1-95 was removed from the DHHS website on February 20, 2015, approximately 4 weeks after the defendants filed their motion for summary judgment and 3 weeks after the plaintiffs filed their cross-motion for summary judgment. Green did not state that Memo 1-95 had been rescinded. Nor did Green address whether homosexual applicants were still subject to a five-tier approval process for placement.

### 4. Arguments Made Below

At the hearing on the motions for summary judgment, the plaintiffs argued that DHHS discriminated on the basis of sexual orientation. The plaintiffs argued that it did so both by virtue of Memo 1-95 and through DHHS' five-tier Pristow Procedure. The defendants did not object to the Pristow Procedure as being outside the scope of the pleadings.

The plaintiffs pointed out that Memo 1-95 has not been rescinded and is used in new employee training; some DHHS employees and private contracting agencies continue to implement it. The plaintiffs pointed out that Memo 1-95 was removed from the website only 2 months before the summary judgment hearing and that it was still not listed on the web page for rescinded policies. The plaintiffs pointed out that the defendants have not given an official announcement that they treat heterosexual and homosexual applicants the same.

The plaintiffs asserted that the confusion about whether Memo 1-95 still applies discourages homosexual applicants. Further, such applicants were "subject to the whims of new employees coming in and out, even at the top level, as to whether they're going to apply a policy that's on the books, or whether they're going to apply their predecessor's policy, or how they're going to treat gay and lesbian applicants."

The plaintiffs argued that the Pristow Procedure is itself discriminatory, because heterosexual applicants, even felons, are subjected to fewer tiers of review than homosexual applicants. Since the extra review is only of approvals and not rejections, the extra review cannot be to protect homosexual

applicants from discrimination. The plaintiffs pointed out that the only possible change in the outcome for the applicant as a result of such review is that a homosexual applicant who was accepted in an earlier level of review is rejected "further up the chain."

In response to these arguments, the defendants acknowledged that Memo 1-95 had not been rescinded, but claimed that rescission was unnecessary. The defendants described Memo 1-95 as "nothing"; it was not DHHS' policy or procedure, was no longer on the DHHS website, and is not elsewhere "on the books." The defendants asserted that the plaintiffs' claims of confusion surrounding Memo 1-95 were speculative and, in any event, "confusion does not equal a constitutional violation."

With regard to the Pristow Procedure, the defendants did not deny that the procedure is still in place. But they argued that "equal protection does not require absolute equality" and that there was no discrimination, because the same best interests standard applied to both homosexual and heterosexual applicants. Further, the defendants argued that the extra levels of review were not directed at the homosexual applicants, but, rather, were a "mechanism for review of the employees and what they are doing within their placement determinations" in order "to prevent bias by the caseworkers."

Lastly, the defendants argued that nothing has prevented the plaintiffs from applying to be foster parents and that there was no remedy for the court to award.

### 5. DISTRICT COURT'S ORDER

The court granted summary judgment in favor of the plaintiffs. The court's original order, dated August 5, 2015, was modified on September 16, following the court's consideration of the defendants' motion to alter or amend the judgment, filed August 17. Both the August 5 and the September 16 orders described the plaintiffs as making both a constitutional challenge to Memo 1-95 and to the discriminatory process of the Pristow Procedure.

The court rejected the defendants' arguments that there is no longer a case and controversy concerning Memo 1-95 because it has not represented DHHS policy or practice since 2012. The court noted that at the time the lawsuit was filed, there was confusion within DHHS surrounding Memo 1-95 insofar as most of the employees deposed believed it to still be DHHS "policy." And the court stated that although the Pristow Procedure may be the "current policy," Memo 1-95 has not been formally rescinded or replaced. The court concluded that "DHHS cannot have two conflicting policies that reflect wholly incompatible interpretations of the same regulations." It found that Memo 1-95 should be stricken in its entirety as in violation of equal protection and due process.

The court likewise found that the Pristow Procedure violated equal protection and due process. It noted that the defendants had failed to identify any legitimate government interest to justify treating homosexual individuals and couples differently from heterosexual individuals and couples. Further, the defendants had conceded that no child welfare interests are advanced by treating homosexual applicants differently from heterosexual applicants. It rejected the defendants' argument that the five-tier approval process was to prevent bias against homosexual individuals and couples, explaining that "[i]f the Defendants wanted to prevent bias against gay and lesbian couples, Defendants would review denials of placements rather than approvals of placements."

The court ordered the defendants to "refrain from adopting or applying policies, procedures, or review processes that treat gay and lesbian individuals and couples differently from similarly situated heterosexual individuals and couples when evaluating foster care or adoption applicants under the 'best interests of the child' standard set forth in DHHS' regulations."

Both orders taxed costs of the action to the defendants.

On August 7, 2015, the court granted the plaintiffs an extension of the time to file a motion for attorney fees and costs, which was ultimately filed on October 16. The motion for attorney fees and costs was filed pursuant to 42 U.S.C. § 1988

(2012). The plaintiffs' attorney filed with the district court 80 pages of affidavits and attached exhibits in support of the motion. Those documents are found in the transcript rather than in the bill of exceptions, because they were not offered as exhibits during a hearing. But a hearing was conducted in which the parties discussed the requested fees and costs. The defendants did not object to the documents supporting the requested fees on the grounds that they were not properly in evidence or otherwise unreliable. The court entered an order on December 15 awarding $28,849.25 in costs and $145,111.30 in attorney fees.

## III. ASSIGNMENTS OF ERROR

The defendants assign that the district court erred by (1) receiving hearsay evidence, (2) granting summary judgment when there were genuine issues of fact, (3) granting summary judgment and issuing an injunction when the plaintiffs did not have standing, (4) deciding a case that was moot, and (5) awarding attorney fees.

## IV. STANDARD OF REVIEW

[1] In reviewing a summary judgment, an appellate court views the evidence in the light most favorable to the party against whom the judgment was granted, and gives that party the benefit of all reasonable inferences deducible from the evidence.[4]

[2] When attorney fees are authorized, the trial court exercises its discretion in setting the amount of the fee, which ruling an appellate court will not disturb on appeal unless the court abused its discretion.[5]

## V. ANALYSIS

The defendants do not contest the underlying merits of the district court's determination that Memo 1-95 and the Pristow

---

[4] *Latzel v. Bartek*, 288 Neb. 1, 846 N.W.2d 153 (2014).

[5] *State v. Rice*, 295 Neb. 241, 888 N.W.2d 159 (2016).

Procedure violate equal protection and due process. Instead, the defendants assert there is a material issue of fact whether the plaintiffs' claims were justiciable. The defendants assert that if the action was not justiciable, the plaintiffs could not be the prevailing parties under 42 U.S.C. § 1988. The defendants also claim the award of attorney fees was an abuse of discretion because the evidence of fees was not presented to the district court in the correct manner.

## 1. Justiciability

[3] We first address whether there was a material issue of fact as to the justiciability of the plaintiffs' claims. Summary judgment is proper if the pleadings and admissible evidence offered at the hearing show that there is no genuine issue as to any material facts or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law.[6] In the summary judgment context, a fact is material only if it would affect the outcome of the case.[7]

[4,5] A justiciable issue requires a present, substantial controversy between parties having adverse legal interests susceptible to immediate resolution and capable of present judicial enforcement.[8] A court decides real controversies and determines rights actually controverted, and does not address or dispose of abstract questions or issues that might arise in a hypothetical or fictitious situation or setting.[9]

### (a) Ripeness

The defendants' principle contention is that the plaintiffs lack standing because they have not yet applied for and been denied foster care licenses and placement of state wards in their care. The defendants argue that the plaintiffs thus have

---

[6] *Latzel v. Bartek, supra* note 4.

[7] *Id.*

[8] *In re Estate of Reading*, 261 Neb. 897, 626 N.W.2d 595 (2001).

[9] *US Ecology v. State*, 258 Neb. 10, 601 N.W.2d 775 (1999).

not been harmed. And they argue that if the plaintiffs are granted licenses and children are placed in their homes, then they never will be harmed. The defendants assert that the controversy presented by the plaintiffs' action is, accordingly, purely hypothetical.

[6,7] Standing is a key function in determining whether a justiciable controversy exists.[10] Standing requires that a litigant have such a personal stake in the outcome of a controversy as to warrant invocation of a court's jurisdiction and justify the exercise of the court's remedial powers on the litigant's behalf.[11]

But the defendants do not argue that the plaintiffs are asserting merely a general injury to the public. They do not argue that if the plaintiffs were to apply for licenses and be denied the ability to provide foster care, they would lack a personal stake in the outcome of the litigation. The defendants' standing argument is more accurately considered one of ripeness.

[8] The ripeness doctrine is rooted in the same general policies of justiciability as standing and mootness.[12] As compared to standing, ripeness assumes that an asserted injury is sufficient to support standing, but asks whether the injury is too contingent or remote to support present adjudication.[13] It is a time dimension of standing.[14]

[9] We use a two-part inquiry to determine ripeness: (1) the jurisdictional question of the fitness of the issues for judicial decision and (2) the prudential question concerning the hardship to the parties of withholding court consideration.[15] We follow the Eighth Circuit, which has explained that

---

[10] *Hall v. Progress Pig, Inc.*, 254 Neb. 150, 575 N.W.2d 369 (1998).

[11] *City of Omaha v. City of Elkhorn*, 276 Neb. 70, 752 N.W.2d 137 (2008).

[12] 13B Charles Alan Wright et al., Federal Practice and Procedure § 3532.1 (2008).

[13] *Id.*

[14] See *id.*

[15] See *City of Omaha v. City of Elkhorn, supra* note 11.

"[t]he 'fitness for judicial decision' inquiry goes to a court's ability to visit an issue. . . . [I]t safeguards against judicial review of hypothetical or speculative disagreements. . . .

"In addition to being fit for judicial resolution, an issue must be such that delayed review will result in significant harm. 'Harm' includes both the traditional concept of actual damages—pecuniary or otherwise—and also the heightened uncertainty and resulting behavior modification that may result from delayed resolution."[16]

Declaratory and injunctive relief, which were sought here, require a justiciable controversy that is ripe for judicial determination.[17] Such actions cannot be used to obtain advisory opinions, adjudicating hypothetical or speculative situations that may never come to pass.[18]

[10] The question of ripeness is to be viewed in light of the relief sought. We have said that a "declaratory judgment is by definition forward-looking, for it provides '"preemptive justice" designed to relieve a party of uncertainty before the wrong has actually been committed or the damage suffered.'"[19] We have explained that the function of a declaratory judgment is to determine justiciable controversies which either are not yet ripe for adjudication by conventional forms of remedy or, for other reasons, are not conveniently amenable to the usual remedies.[20] The purpose of an injunction,

---

[16] *Id*. at 80, 752 N.W.2d at 145-46, quoting *Nebraska Public Power Dist. v. MidAmerican Energy*, 234 F.3d 1032 (2000).

[17] See, *Ryder Truck Rental v. Rollins*, 246 Neb. 250, 518 N.W.2d 124 (1994); 43A C.J.S. *Injunctions* § 76 (2014).

[18] See, *Greater Omaha Realty Co. v. City of Omaha*, 258 Neb. 714, 605 N.W.2d 472 (2000); *Ryder Truck Rental v. Rollins, supra* note 17. See, also, *Crete Ed. Assn. v. Saline Cty. Sch. Dist. No. 76-0002*, 265 Neb. 8, 654 N.W.2d 166 (2002).

[19] See, *Hauserman v. Stadler*, 251 Neb. 106, 110, 554 N.W.2d 798, 801 (1996); *Ryder Truck Rental v. Rollins, supra* note 17.

[20] See *id*. See, also, e.g., *Central City Ed. Assn. v. Merrick Cty. Sch. Dist.*, 280 Neb. 27, 783 N.W.2d 600 (2010).

similarly, is to restrain actions that have not yet been taken.[21] Injunctive relief is generally preventative, prohibitory, or protective.[22]

We reject the defendants' contention that the harm at issue in this action is too remote or speculative to be ripe for the protective, forward-looking relief sought and obtained by the plaintiffs. Fundamentally, the defendants mischaracterize the harm the plaintiffs seek to prevent.

The harm the plaintiffs wish to avoid is not just the possible, ultimate inability to foster state wards; it is the discriminatory stigma and unequal treatment that homosexual foster applicants and licensees must suffer if they wish to participate in the foster care system. The imminent injury that the court redressed was the plaintiffs' inability to be treated on equal footing with heterosexual applicants.[23]

[11] We find several U.S. Supreme Court cases instructive on this issue. The U.S. Supreme Court has specifically rejected the argument that persons claiming denial of equal treatment must demonstrate their ultimate inability to obtain a benefit in order for their claims to be justiciable.[24] As noted by the district court below, the Court has explained that the injury in an equal protection case is the imposition of a barrier that makes it more difficult for members of one group to obtain a benefit, rather than the ultimate inability to obtain the benefit.[25] This proposition directly contradicts the defendants' argument that the plaintiffs would suffer no harm unless they applied to be foster parents and were ultimately denied placement of state wards in their homes.

---

[21] *Putnam v. Fortenberry*, 256 Neb. 266, 589 N.W.2d 838 (1999).

[22] *Crete Ed. Assn. v. Saline Cty. Sch. Dist. No. 76-0002, supra* note 18.

[23] See *Revelis v. Napolitano*, 844 F. Supp. 2d 915 (N.D. Ill. 2012).

[24] *Northeastern Fla. Chapter, Associated Gen. Contractors of America v. City of Jacksonville*, 508 U.S. 656, 113 S. Ct. 2297, 124 L. Ed. 2d 586 (1993).

[25] See *id.*

[12] The U.S. Supreme Court has applied this proposition in the context of affirmative action bidding programs and school application processes, holding that a plaintiff has standing to make a claim challenging the inability to compete on an equal footing no matter whether the plaintiff would have been admitted to the school or obtained the winning bid but for that unequal treatment.[26] The Court has held that when the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, a member of the former group seeking to challenge the barrier need only demonstrate that he or she is ready and able to perform and that a discriminatory policy prevents him or her from doing so on an equal basis.[27]

In other cases, the Court has elaborated on the stigmatic injury that stems from discriminatory treatment. The Court has explained that the discriminatory treatment itself is a serious harm that supports standing. In *Heckler v. Mathews*,[28] for example, the Court addressed the plaintiff's claim that Social Security laws subjected him to unequal benefits on the basis of gender. The Court found standing, despite the fact that a successful action would result in the plaintiff's benefits remaining the same (while, due to the severability of the discriminatory provision, female applicants' benefits would decrease).[29]

[13] The Court stated it had "repeatedly emphasized" that
> discrimination itself, by perpetuating "archaic and stereotypic notions" or by stigmatizing members of the

---

[26] See, *Northeastern Fla. Chapter, Associated Gen. Contractors of America v. City of Jacksonville, supra* note 24; *University of California Regents v. Bakke*, 438 U.S. 265, 98 S. Ct. 2733, 57 L. Ed. 2d 750 (1978).

[27] See *Northeastern Fla. Chapter, Associated Gen. Contractors of America v. City of Jacksonville, supra* note 24.

[28] *Heckler v. Mathews*, 465 U.S. 728, 104 S. Ct. 1387, 79 L. Ed. 2d 646 (1984). See, also, *Barber v. Bryant*, 193 F. Supp. 3d 677 (S.D. Miss. 2016); *Campaign for Southern Equality v. Bryant*, 64 F. Supp. 3d 906 (S.D. Miss. 2014); *De Leon v. Perry*, 975 F. Supp. 2d 632 (W.D. Tex. 2014).

[29] *Heckler v. Mathews, supra* note 28.

disfavored group as "innately inferior" and therefore as less worthy participants in the political community, . . . can cause serious noneconomic injuries to those persons who are personally denied equal treatment solely because of their membership in a disfavored group.[30]

The Court reiterated that when the right invoked is that of equal treatment, the appropriate remedy is a mandate of equal treatment.[31] Similarly, in *Allen v. Wright*,[32] the U.S. Supreme Court explained that for those persons who are personally subject to discriminatory treatment, stigmatizing injury caused by discrimination is a serious noneconomic injury that is sufficient to support standing.

As for the ripeness questions of whether this harm is too remote and whether delayed review will result in significant harm, the Court held in the bidding cases that the plaintiffs seeking to prevent future deprivation of the equal opportunity to compete need only demonstrate they will "sometime in the relatively near future" bid on a contract governed by such race-based financial incentives.[33]

[14] In a number of cases in other jurisdictions similar to the case at bar, courts have found plaintiffs to have standing in spite of the absence of any formal application under the challenged program or law.[34] This is because standing does not

---

[30] *Id.*, 465 U.S. at 739-40 (citation omitted).

[31] *Heckler v. Mathews, supra* note 28.

[32] *Allen v. Wright*, 468 U.S. 737, 104 S. Ct. 3315, 82 L. Ed. 2d 556 (1984), *abrogated on other grounds, Lexmark Intern. v. Static Control*, ___ U.S. ___, 134 S. Ct. 1377, 188 L. Ed. 2d 392 (2014).

[33] *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 211, 115 S. Ct. 2097, 132 L. Ed. 2d 158 (1995).

[34] *Dragovich v. U.S. Department of the Treasury*, 764 F. Supp. 2d 1178 (N.D. Cal. 2011). See, also, *Reno v. Catholic Social Services, Inc.*, 509 U.S. 43, 113 S. Ct. 2485, 125 L. Ed. 2d 38 (1993); *Teamsters v. United States*, 431 U.S. 324, 97 S. Ct. 1843, 52 L. Ed. 2d 396 (1977); *LeClerc v. Webb*, 419 F.3d 405 (5th Cir. 2005); *Terry v. Cook*, 866 F.2d 373 (11th Cir. 1989); *Waters v. Ricketts*, 48 F. Supp. 3d 1271 (D. Neb. 2015).

require exercises in futility.[35] "Courts have long recognized circumstances in which a failure to apply may be overcome by facts which demonstrate the futility of such application."[36]

In *Teamsters v. United States*,[37] the U.S. Supreme Court explained that "[i]f an employer should announce his policy of discrimination by a sign reading 'Whites Only' on the hiring-office door, his victims would not be limited to the few who ignored the sign and subjected themselves to personal rebuffs." Thus, the Court rejected the argument that those who failed to apply for the position that discriminatory practices made it difficult to obtain could not share in the "make-whole relief" that was sought in the action.[38] Rather, such plaintiffs must show that they should be treated as applicants, or "potential victim[s]," of the discrimination, by showing they were actually deterred by the discriminatory practice and would have applied but for that practice.[39]

The Court explained that a plaintiff's desire for a job need not be "translated into a formal application solely because of his unwillingness to engage in a futile gesture."[40] The nonapplicant is unwilling to subject himself or herself to the humiliation of certain rejection.[41] Such a nonapplicant is as much a victim of discrimination as the applicant.[42]

Memo 1-95 was a published statement on DHHS' official website that "heterosexuals only" need apply to be foster

---

[35] *Dragovich v. U.S. Department of the Treasury, supra* note 34. See, also, e.g., *LeClerc v. Webb, supra* note 34; *Terry v. Cook, supra* note 34.

[36] *Terry v. Cook, supra* note 34, 866 F.2d at 378.

[37] *Teamsters v. United States, supra* note 34, 431 U.S. at 365. See, also, e.g., *Reno v. Catholic Social Services, Inc., supra* note 34.

[38] *Teamsters v. United States, supra* note 34, 431 U.S. at 367.

[39] *Id.*

[40] *Id.*, 431 U.S. at 366.

[41] See *Teamsters v. United States, supra* note 34.

[42] See *id.*

parents. It is legally indistinguishable from a sign reading "Whites Only" on the hiring-office door. Memo 1-95 clearly excluded same-sex couples and individuals who identified as homosexuals either from being licensed or from having state wards placed in their homes. There is no dispute that all the plaintiffs were ready and able to be foster parents, were aware of and deterred by Memo 1-95, and would have taken further steps to become foster parents but for the barrier expressed in Memo 1-95. The plaintiffs considered any further action to be futile and did not wish to subject themselves to the humiliation of rejection and the stigmatic harm of unequal treatment.

There was a barrier to equal treatment and serious noneconomic injuries that the plaintiffs would be imminently subjected to upon application to become foster parents. The plaintiffs could only ultimately foster children through an uncertain exception to the absolute ban set forth in Memo 1-95 or through a five-tier review procedure that subjected them to increased scrutiny because of their sexual orientation. In either scenario, the plaintiffs would suffer stigmatic harm stemming from systematic unequal treatment. By seeking forward-looking relief, the plaintiffs wished to avoid suffering the discrimination inherent in Memo 1-95 and the Pristow Procedure.

What is more, there is no dispute in the record that Todd and Joel actually began the process of applying by completing training, a home study, and background checks. After a significant delay in the progression of their case, they contacted the director as well as the chief executive officer of DHHS, who both either directly or indirectly confirmed the continuing force and effect of Memo 1-95. In addressing the by-then 3-year delay, Winterer relied repeatedly on Memo 1-95 and stated it was "still in force." In an action where multiple plaintiffs seek identical injunctive or declaratory relief, once the court determines that one of the plaintiffs has standing, it need

not decide the standing of the others in order to determine that the action is justiciable.[43] For if one plaintiff prevails on the merits, the same prospective relief will issue regardless of the standing of the other plaintiffs.[44] Clearly, Todd and Joel did not need to subject themselves to even more personal rebuffs in order to demonstrate their personal stake in this action and the ripeness of their claim.

We agree with the district court that the controversy raised by the plaintiffs is neither hypothetical nor speculative by virtue of the fact that the plaintiffs have not yet applied for and been denied foster care licenses and placement of state wards in their homes. And we agree with the district court that the harm at issue is appropriate for the preemptive justice that declaratory and injunctive relief provide. The plaintiffs were faced with the unavoidable inability to be treated on equal footing if they wished to pursue being foster parents, and the district court's order effected an immediate resolution of that imminent and serious harm. We find no merit to the defendants' narrow view that the action presented a hypothetical harm because the plaintiffs have not shown an ultimate inability to become foster parents.

---

[43] *Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, 547 U.S. 47, 126 S. Ct. 1297, 164 L. Ed. 2d 156 (2006); *Melendres v. Arpaio*, 695 F.3d 990 (9th Cir. 2012); *New Jersey Physicians, Inc. v. President of U.S.*, 653 F.3d 234 (3d Cir. 2011); *Parker v. Scrap Metal Processors, Inc.*, 386 F.3d 993 (11th Cir. 2004); *Save Our Heritage, Inc. v. F.A.A.*, 269 F.3d 49 (1st Cir. 2001); *Mountain States Legal Foundation v. Glickman*, 92 F.3d 1228 (D.C. Cir. 1996); *Kelley v. Selin*, 42 F.3d 1501 (6th Cir. 1995); *Heckman v. Williamson County*, 369 S.W.3d 137 (Tex. 2012); *MacPherson v. DAS*, 340 Or. 117, 130 P.3d 308 (2006); *Cohen v. Zoning Bd. of Appeals*, 35 Mass. App. 619, 624 N.E.2d 119 (1993). See, also, e.g., Joan Steinman, *The Effects of Case Consolidation on the Procedural Rights of Litigants: What They Are, What They Might Be Part 1: Justiciability and Jurisdiction (Original and Appellate)*, 42 U.C.L.A. L. Rev. 717 (1995).

[44] *Patel v. Dept. of Licensing and Regulation*, 469 S.W.3d 69 (Tex. 2015).

(b) Mootness

[15] The defendants alternatively claim the plaintiffs lacked a justiciable claim, because Memo 1-95 no longer represented official DHHS policy or practice by the time the plaintiffs filed this action. In order to maintain an action to enforce private rights, the plaintiff must show that he or she will be benefited by the relief to be granted.[45] An action becomes moot when the issues initially presented in the proceedings no longer exist or the parties lack a legally cognizable interest in the outcome of the action.[46] At the latest, the defendants believe that any issue concerning Memo 1-95 became moot in February 2015, when Memo 1-95 was taken off the DHHS website during the pendency of the parties' motions for summary judgment.

This list of memorandums was designed to be viewed by the public, and new DHHS employees were directed to familiarize themselves with DHHS policy by looking at the memorandums on the website. As late as November 2011, DHHS officials with the authority to declare DHHS policy and procedure represented to same-sex couples that Memo 1-95 was still in force. The continuing presence of Memo 1-95 on the DHHS website at the time this action was filed affirmed these representations.

Pristow intentionally avoided formal rescission of Memo 1-95 and, in fact, avoided creating anything in writing disavowing it or stating a policy or practice different from that articulated in Memo 1-95. The Pristow Procedure was strictly verbal, and DHHS employees were told about the Pristow Procedure only if and when they were confronted with homosexual applicants. Pristow deliberately kept Memo 1-95 on the DHHS website, and the Pristow Procedure was never

---

[45] *Id.*

[46] See *Mullendore v. Nuernberger*, 230 Neb. 921, 434 N.W.2d 511 (1989).

communicated to the public. In fact, it can be surmised that the plaintiffs did not learn of the Pristow Procedure until discovery conducted during the current lawsuit.

[16] If a discriminatory policy is openly declared, then it is unnecessary for a plaintiff to demonstrate it is followed in order to obtain injunctive or declaratory relief.[47] We thus find immaterial any dispute in the record as to whether the Pristow Procedure was a policy versus a practice, whether it "replaced" Memo 1-95, or the level of confusion within DHHS and its contractors concerning DHHS' policy and practice when this action was filed. A secret change in policy or procedure cannot moot an action based on a published policy statement that has been cited by the agency as excluding the plaintiffs from eligibility.

Memo 1-95 was deliberately maintained on the website in order to give the public the impression that it represented official DHHS policy. The defendants cannot now complain that the plaintiffs believed it so, were deterred by the discriminatory exclusion set forth so clearly therein, and brought this action to challenge it.

[17,18] As for DHHS' eleventh-hour removal of Memo 1-95 from its website, it is well recognized that "a defendant cannot automatically moot a case simply by ending its unlawful conduct once sued."[48] If voluntary cessation of that kind rendered a case moot, "a defendant could engage in unlawful conduct, stop when sued to have the case declared moot, then pick up where he left off, repeating this cycle until he achieves all his unlawful ends."[49] "'[A] defendant claiming that its voluntary compliance moots a case bears the formidable burden of showing that it is absolutely clear the allegedly wrongful

---

[47] See *U.S. v. Bd. of Educ. of School D. of Philadelphia*, 911 F.2d 882 (3d Cir. 1990).

[48] *Already, LLC v. Nike, Inc.*, ___ U.S. ___, 133 S. Ct. 721, 727, 184 L. Ed. 2d 553 (2013).

[49] *Id.*

behavior could not reasonably be expected to recur.'"[50] This standard is "stringent."[51] The defendants made no attempt to meet this standard.

Finally, we note that any argument that the plaintiffs' action is moot because the Pristow Procedure superseded Memo 1-95 ignores the fact that the Pristow Procedure itself was challenged in this action and was encompassed by the injunctive and declaratory relief granted by the district court's order. The defendants make no argument that the five-tier Pristow Procedure is no longer in effect or that the plaintiffs' action with regard to the Pristow Procedure is otherwise nonjusticiable. In their brief, the defendants make no arguments concerning the Pristow Procedure other than to assert that it superseded Memo 1-95.

[19] The defendants mentioned at oral arguments that the Pristow Procedure was not specifically alleged in the plaintiffs' complaint. Thus, they believed that if they could show that the Pristow Procedure replaced Memo 1-95, there was no action. But this court's consideration of a cause on appeal is limited to errors assigned and discussed.[52] The defendants assigned neither error below nor on appeal asserting that the Pristow Procedure was beyond the scope of the pleadings or that they lacked timely notice of the Pristow Procedure's being at issue in the case. To the contrary, the plaintiffs argued to the district court that the Pristow Procedure was unconstitutionally discriminatory, and the defendants argued that it was not.

The plaintiffs, having no apparent way of knowing about the Pristow Procedure before filing their action, alleged as the operative fact in their complaint the discriminatory exclusion articulated in Memo 1-95. The defendants raised the

---

[50] *Id.* (quoting *Friends of Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 120 S. Ct. 693, 145 L. Ed. 2d 610 (2000)).

[51] *Friends of Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc., supra* note 50, 528 U.S. at 189.

[52] See, Neb. Rev. Stat. § 25-1919 (Reissue 2016); *In re Estate of Balvin*, 295 Neb. 346, 888 N.W.2d 499 (2016).

Pristow Procedure in the hearing on the motions for summary judgment in the hope of mooting the plaintiffs' claim. The defendants also hoped that a discriminatory process allowing for the possibility of fostering a child was somehow constitutional even if the absolute prohibition of Memo 1-95 was not. Finally, the defendants argued that the ultimate possibility of fostering inherent to the Pristow Procedure meant that the plaintiffs could demonstrate no imminent harm—an argument that, if accepted, could have left unequal scrutiny of the Pristow Procedure immune from challenge.

At the same time that the defendants relied so heavily on the Pristow Procedure for their defense, they remained silent as to the clearly expanded scope of the operative facts at issue in the plaintiffs' action. While, in general, we caution plaintiffs to amend their pleadings when discovery reveals new operative facts, the defendants' maneuverings here are unavailing.

We will not reverse the district court's judgment on the ground that the Pristow Procedure superseded Memo 1-95. Memo 1-95 was openly declared, and DHHS chose not to inform the public that it was no longer followed. Neither did DHHS moot the plaintiffs' case through its voluntary removal of Memo 1-95 from the website following the motions for summary judgment. And, regardless of the status of Memo 1-95, the plaintiffs were the prevailing parties with regard to the discriminatory nature of the Pristow Procedure.

## 2. ATTORNEY FEES

Beyond the defendants' arguments attacking the justiciability of the plaintiffs' underlying claims, with the ultimate goal of preventing the plaintiffs from being the prevailing parties for purposes of attorney fees, the defendants assert that there was insufficient evidence of attorney fees. The defendants make this argument solely on the ground that the evidence of attorney fees was filed with the clerk of the district court and is found only in the transcript. Evidence of attorney fees was not entered into evidence as exhibits and that evidence is not, therefore, found in the bill of exceptions.

The attorney fees in this case were awarded pursuant to 42 U.S.C. § 1988. Section 1988(b) states in relevant part that "[i]n any action or proceeding to enforce a provision of [§] 1983, . . . the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs . . . ." We have said that affidavits included in the transcript, but not received as evidence and appearing in the bill of exceptions, cannot be considered on appeal by the appellate court.[53] Such affidavits must be "preserved" for appellate review in the bill of exceptions.[54] We have explained that offering of a bill of exceptions is necessary at some point if the appellate court is to consider errors assigned by the appellant which require a review of the evidence that was received by the tribunal from which the appeal is taken.[55]

But the defendants are the appellants in this case; they wish us to consider their assignment of error that the lower court abused its discretion in awarding attorney fees. Generally, in determining whether there is merit to an appellant's claim that the lower court's judgment should be reversed, it will be presumed in the absence of a bill of exceptions that issues of fact presented by the pleadings were established by the evidence.[56]

True, where an appellant argues on appeal that the evidence is insufficient on a point for which an appellee bore the burden of proof, we will not simply presume there was evidence before the lower court, which we have no evidence of despite the filing of a bill of exceptions.[57] But we have never held

---

[53] See, *State v. Dean*, 270 Neb. 972, 708 N.W.2d 640 (2006); *State v. Allen*, 159 Neb. 314, 66 N.W.2d 830 (1954).

[54] *State v. Allen, supra* note 53, 159 Neb. at 321, 66 N.W.2d at 835.

[55] See *Marcotte v. City of Omaha*, 196 Neb. 217, 241 N.W.2d 838 (1976).

[56] See, *State v. Allen, supra* note 53; *McMillan v. Diamond*, 77 Neb. 671, 110 N.W. 542 (1906).

[57] See, e.g., *Emery v. Moffett*, 269 Neb. 867, 697 N.W.2d 249 (2005).

that an appellant may successfully assert that the evidence was insufficient to support a lower court's order when the record on appeal affirmatively demonstrates that sufficient evidence was considered by the lower court, with notice to and without objection by the appellant, but that such evidence was received through filing with the clerk of the court rather than at a hearing wherein it became part of the bill of exceptions.

To the contrary, in *Zwink v. Ahlman*,[58] we expressly rejected the appellants' contention that the lower court's judgment was not sustained by the evidence because the necessary evidence was attached to the petition and placed in the transcript, but was not entered as an exhibit to be found in the bill of exceptions. We observed that the journal of the trial court showed that the evidence in question was considered and that no specific objection was raised on the ground that the evidence was not formally admitted.[59] We concluded that under such circumstances, the evidence was to be considered as if made a part of the bill of exceptions.[60]

We explained that it would be repugnant to the general rules of equity governing the underlying action to dismiss the proceeding because the evidence was "not formally introduced in evidence when the transcript shows they were duly filed and the judgment of the trial court shows [the evidence was] considered by it."[61] Furthermore, to remand the cause for retrial because the evidence was not formally introduced when the evidence was before us in the transcript and was considered by the trial court, "would appear a circuitous and useless procedure if a proper decision is possible by considering them as evidence along with the bill of exceptions at this time."[62]

---

[58] *Zwink v. Ahlman*, 177 Neb. 15, 128 N.W.2d 121 (1964).

[59] See *id.*

[60] *Id.*

[61] *Id.* at 19-20, 128 N.W.2d at 124.

[62] *Id*. at 20, 128 N.W.2d at 124-25.

Similarly, in *Nimmer v. Nimmer*,[63] we affirmed an award of attorney fees despite the fact that the evidence of those fees was found only as an itemized list of services rendered, attached to the application for fees, and not in the bill of exceptions. We observed that it was clear that there was a hearing on the fees, but no bill of exceptions was created for that hearing.

And in *Chilen v. Commercial Casualty Ins. Co.*,[64] we affirmed the award of attorney fees despite the fact that the evidence of such fees, though apparently presented at the hearing, was not embodied in the bill of exceptions. The appellant was the party opposing the fees, and we found that with no bill of exceptions, the pleadings were sufficient to support the judgment awarding the fees.[65]

The defendants' only argument that there was insufficient evidence to support the lower court's award of fees is that the evidence of those fees is found in the transcript rather than in the bill of exceptions. However, the appellate record is clear that extensive evidence supporting attorney fees was filed with the clerk of the district court, examined by the district court, and addressed by both parties during the hearing on fees and costs. The defendants did not raise at this hearing any issue regarding the method by which the evidence was brought before the court. They did not raise any objection to the fees other than to assert that they were excessive. The district court clearly found the exhibits adequate and reduced the amount of its award in light of the defendants' arguments, made upon examination of the evidence found in the transcript.

These facts are clearly distinguishable from *Lomack v. Kohl-Watts*,[66] a case relied upon by the defendants. In *Lomack*, it was the appellant who assigned as error the denial of fees below.

---

[63] *Nimmer v. Nimmer*, 203 Neb. 503, 279 N.W.2d 156 (1979).

[64] *Chilen v. Commercial Casualty Ins. Co.*, 135 Neb. 619, 283 N.W. 366 (1939).

[65] *Id.*

[66] *Lomack v. Kohl-Watts*, 13 Neb. App. 14, 688 N.W.2d 365 (2004).

And there was no indication in the appellate record that the evidence of attorney fees, found only in the transcript, was actually filed with the clerk of the lower court. Neither was there any evidence that the opposing party had notice of the evidence and an opportunity to object to it, or that such evidence was considered by the lower court in making its determination regarding fees.

[20] On appeal, a trial court's decision awarding or denying attorney fees will be upheld absent an abuse of discretion.[67] Upon the record before us, we cannot conclude that the district court abused its discretion in awarding costs and attorney fees to the plaintiffs.

### 3. HEARSAY

We do not need to address the defendants' assignment of error relating to the admission in evidence of several newspaper articles. The defendants assert these articles were inadmissible hearsay. These articles played no role in our determination that the underlying action was justiciable.

### VI. CONCLUSION

We find no merit to the defendants' claims that the underlying action was not justiciable. Nor do we find any merit to the defendants' claims that the district court abused its discretion in awarding costs and attorney fees, simply because the evidence of those fees is found in the appellate transcript rather than in the bill of exceptions. We find no merit to the defendants' assignments of error; therefore, we affirm the judgment of the district court.

AFFIRMED.

---

[67] *Cisneros v. Graham*, 294 Neb. 83, 881 N.W.2d 878 (2016).