Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
12/12/2025 08:09 AM CST

LAUREN RAMAEKERS ET AL., APPELLANTS, V.
CREIGHTON UNIVERSITY, A NEBRASKA
NONPROFIT CORPORATION, APPELLEE.

___ N.W.3d ___

Filed December 12, 2025.    No. S-24-407.

1. **Motions to Dismiss: Rules of the Supreme Court: Pleadings: Appeal and Error.** A district court's grant of a motion to dismiss for failure to state a claim under Neb. Ct. R. Pldg. § 6-1112(b)(6) is reviewed de novo, accepting all the allegations in the complaint as true and drawing all reasonable inferences in favor of the nonmoving party.

2. **Rules of the Supreme Court: Pleadings: Appeal and Error.** An appellate court reviews a district court's denial of a motion to amend under Neb. Ct. R. Pldg. § 6-1115(a) for an abuse of discretion. However, an appellate court reviews de novo any underlying legal conclusion that the proposed amendments would be futile.

3. **Moot Question.** Mootness refers to events occurring after the filing of a suit that eradicate the requisite personal interest in the dispute's resolution that existed at the beginning of the litigation.

4. **Actions: Moot Question.** An action becomes moot when the issues initially presented in the proceedings no longer exist or the parties lack a legally cognizable interest in the outcome of the action.

5. **Moot Question.** The central question in a mootness analysis is whether changes in circumstances have forestalled any occasion for meaningful relief.

6. **Moot Question: Dismissal and Nonsuit.** A moot case is subject to dismissal.

7. **Motions to Dismiss: Pleadings.** To prevail against a motion to dismiss for failure to state a claim, a plaintiff must allege sufficient facts, accepted as true, to state a claim to relief that is plausible on its face.

8. **____: ____.** A motion to dismiss should be granted only in the unusual case in which a plaintiff includes allegations that show on the face of the complaint that there is some insuperable bar to relief.

9. **Contracts: Parties: Intent.** An implied contract arises where the intention of the parties is not expressed in writing but where the circumstances are such as to show a mutual intent to contract.

10. ____: ____: ____. The determination of the parties' intent to make a contract is to be gathered from objective manifestations—the conduct of the parties, language used, or acts done by them, or other pertinent circumstances surrounding the transaction. If the parties' conduct is sufficient to show an implied contract, it is just as enforceable as an express contract.

11. **Contracts: Intent.** As a general matter, the terms of an implied contract are a question of fact to be determined by the jury based on the evidence presented.

12. **Appeal and Error.** Alleged errors of the lower court must be both specifically assigned and specifically argued in the brief of the party asserting the errors to be considered by an appellate court.

13. **Conversion: Words and Phrases.** Conversion is any unauthorized or wrongful act of dominion exerted over another's property which deprives the owner of his property permanently or for an indefinite period of time.

14. **Conversion: Pleadings.** In an action for conversion, the plaintiff must allege facts showing a right to immediate possession of the property at the time of the conversion.

15. **Consumer Protection: Intent.** The Consumer Protection Act, Neb. Rev. Stat. §§ 59-1601 to 59-1622 (Reissue 2021), was intended to be an antitrust measure to protect Nebraska consumers from monopolies and price-fixing conspiracies.

16. ____: ____. The purpose of the Consumer Protection Act is to provide consumers with protection against unlawful practices in the conduct of any trade or commerce which directly affects the people of Nebraska.

17. **Pleadings: Rules of the Supreme Court.** Where leave to amend is sought before discovery is complete and before a motion for summary judgment has been filed, leave to amend should be denied as futile only if the proposed amendment cannot withstand a motion to dismiss under Neb. Ct. R. Pldg. § 6-1112(b)(6).

18. **Pleadings.** Leave to amend should not be granted when it is clear that the defect cannot be cured by amendment.

Appeal from the District Court for Douglas County: MARLON A. POLK, Judge. Affirmed in part, and in part reversed and remanded for further proceedings.

Robert M. Sullivan, of Sullivan Law, P.C., L.L.O., for appellants.

William F. Hargens, Abigail M. Moland, and Britni A. Summers, of McGrath, North, Mullin & Kratz, P.C., L.L.O., for appellee.

Funke, C.J., Miller-Lerman, Cassel, Stacy, Papik, Freudenberg, and Bergevin, JJ.

Funke, C.J.

## I. INTRODUCTION

During the COVID-19 pandemic, Creighton University (Creighton) imposed a vaccine mandate on all its students. The appellants are Creighton students, all but one of whom declined to receive the vaccine by the appointed deadline, which resulted in their unenrollment from Creighton. The students brought suit, alleging claims for breach of contract, due process violations, conversion, negligence, and violations of Nebraska's Consumer Protection Act (NCPA).[1] The district court for Douglas County dismissed their allegations with prejudice for failure to state a claim, and the students appealed. We conclude that the students have stated plausible claims for breach of an implied contract and conversion. Otherwise, we find no merit to the students' remaining claims. Accordingly, we reverse the district court's decision and remand the cause for further proceedings on the breach of contract and conversion claims but affirm the district court's decision on all other matters.

## II. BACKGROUND

Before we begin, we make a procedural and factual note. This matter is before us on a motion to dismiss. During the hearing on the motion to dismiss, however, the parties offered

---

[1] Neb Rev. Stat. §§ 59-1601 to 59-1622 (Reissue 2021).

evidence outside of the scope of the pleadings, which is inappropriate on a motion to dismiss.[2] As a result, Creighton now argues that the motion was converted into one for summary judgment and that, therefore, on our review, we should consider matters outside of the pleadings. Creighton mentions a variety of such materials in its brief.

In this case, we see no reason to consider this matter as anything other than a motion to dismiss. The district court's order gave no indication that it treated the matter as a motion for summary judgment. To the contrary, the order described the matter as a motion to dismiss and captioned its order accordingly. The parties' filings on the matter also all referenced a motion to dismiss. As such, we decline to consider facts outside of those alleged in the pleadings or in the materials incorporated thereby, and the following recitation of the facts comports accordingly.

## 1. CREIGHTON'S VACCINE POLICY

On May 26, 2021, Creighton issued a statement indicating that, effective July 7, 2021, it would require all students to be vaccinated against COVID-19. This statement added the COVID-19 vaccination to the list of mandatory vaccines students were required to receive, including vaccines for measles, mumps, and rubella. The students were also informed that they could not register for classes or housing until proof of vaccination had been provided.

---

[2] See *DMK Biodiesel v. McCoy*, 285 Neb. 974, 980, 830 N.W.2d 490, 496 (2013) ("[f]or purposes of a motion to dismiss, '"the court generally must ignore materials outside the pleadings, but it may consider some materials that are part of the public record or do not contradict the complaint, as well as materials that are necessarily embraced by the pleadings"'"). See, also, *Trausch v. Hagemeier*, 313 Neb. 538, 550, 985 N.W.2d 402, 413 (2023) ("[b]ecause a motion to dismiss under [Neb. Ct. R. Pldg.] § 6-1112(b)(6) tests the legal sufficiency of the complaint, not the claim's substantive merits, a court may typically look only at the face of the complaint to decide a motion to dismiss").

Creighton's policy did not permit religious exemptions but allowed students to request a medical exemption. Students could also request an exemption due to the "Emergency Use Authorization" (EUA) status of the vaccine, although that exemption would be valid only until the U.S. Food and Drug Administration (FDA) approved a vaccine. To receive an EUA exemption, students had to sign a form agreeing with the statement "I am requesting to decline the COVID-19 vaccination until it has full approval by the [FDA] at which time I agree to meet this requirement within 6-8 weeks."

On August 23, 2021, the FDA approved the Pfizer vaccine. Thereafter, Creighton mandated through correspondence that all students, including those who had received EUA exemptions, receive the first dose of the vaccine by 4:30 p.m. on September 7. In this correspondence, Creighton informed students that they could (1) be vaccinated, (2) withdraw from Creighton prior to September 7, or (3) wait for Creighton to administratively withdraw them.

## 2. Appellants

The appellants were all students at Creighton at the time of the vaccine mandate. The students maintained religious objections to receiving the vaccine. The record contains signed EUA exemptions from four of the students, but it is unclear from the record whether the other students also submitted such a form.

In response to Creighton's actions, several students declined to receive the vaccine. As a result, on September 9, 2021, those students were unenrolled and barred from campus. Creighton also placed a hold on their student accounts, preventing them from accessing their transcripts. One student, Kristin Hultgren, did receive the vaccine but subsequently experienced long-lasting negative side effects. She was given a medical exemption from receiving the second dose of the vaccine. Yet another student opted to voluntarily withdraw from Creighton prior to the September 7 deadline.

### 3. Procedural History

#### (a) Injunctive Relief

Just prior to the 4:30 p.m. deadline on September 7, 2021, several students filed a motion seeking to enjoin Creighton from unenrolling the students who chose not to be vaccinated. The complaint initially alleged only claims for breach of contract and unjust enrichment.

Ultimately, the court denied injunctive relief. In doing so, it found that to the extent there was a contract between the parties, the contract included the EUA agreements. As such, the court concluded that the students had breached the contract by failing to be vaccinated once the FDA approved the Pfizer vaccine. The court also found that the students had not shown any irreparable harm or a likelihood of success on the merits.

The students appealed. This court heard the matter, but determined that, because of the lack of a final, appealable order, we were without jurisdiction over the case.[3] As such, the appeal was dismissed.

#### (b) Operative Complaint

Following our decision, several related actions by the students were consolidated, resulting in the configuration of appellants currently party to this action, and the operative complaint was filed. That complaint alleged five causes of action: (1) breach of implied contract, (2) violation of due process, (3) conversion, (4) negligence, and (5) violations of the NCPA.

#### (c) Subsequent Proceedings

In response, Creighton filed a motion to dismiss or, alternatively, for a more definite statement. The district court granted

---

[3] See, *Ramaekers v. Creighton University*, 312 Neb. 248, 978 N.W.2d 298 (2022).

Creighton's motion and dismissed the complaint with prejudice. In doing so, the court provided no reasoning and stated only that "[h]aving considered the evidence as appropriate and the briefs of the parties, [it] finds that [Creighton's] Motion to Dismiss should be, and hereby is, granted."

The students filed a motion for a new trial and sought leave to amend the complaint to make it more definite and certain. The court denied this motion, again stating only that "[h]aving considered the arguments of the parties and being fully advised, [the motion] is hereby overruled and denied."

The students appealed, and we moved the matter to our docket.[4]

### III. ASSIGNMENTS OF ERROR

The students assign, restated, that the district court erred in (1) granting Creighton's motion to dismiss their complaint with prejudice for failure to state a claim and (2) denying their request to file an amended complaint.

### IV. STANDARD OF REVIEW

[1] A district court's grant of a motion to dismiss for failure to state a claim under Neb. Ct. R. Pldg. § 6-1112(b)(6) is reviewed de novo, accepting all the allegations in the complaint as true and drawing all reasonable inferences in favor of the nonmoving party.[5]

[2] An appellate court reviews a district court's denial of a motion to amend under Neb. Ct. R. Pldg. § 6-1115(a) for an abuse of discretion. However, an appellate court reviews de novo any underlying legal conclusion that the proposed amendments would be futile.[6]

---

[4] Neb. Rev. Stat. § 24-1106(3) (Cum. Supp. 2024).

[5] *Anderson v. Wells Fargo Fin. Accept.*, 269 Neb. 595, 694 N.W.2d 625 (2005).

[6] *Sinu v. Concordia University*, 313 Neb. 218, 983 N.W.2d 511 (2023).

## V. ANALYSIS

### 1. Mootness

In April 2022, after the facts of this case were already developed, Creighton changed its vaccine policy to accommodate religious exemptions. Accordingly, Creighton now asserts that the students' claims are moot because, based on its new vaccine policy, the students could "stay enrolled or reenroll at Creighton without obtaining the COVID-19 vaccine."[7] Indeed, Creighton points out that several of the students did, in fact, return and have since graduated from Creighton. Thus, we must first determine whether Creighton's change in policy has rendered this appeal moot. We conclude that it has not.

[3-6] Mootness refers to events occurring after the filing of a suit that eradicate the requisite personal interest in the dispute's resolution that existed at the beginning of the litigation.[8] An action becomes moot when the issues initially presented in the proceedings no longer exist or the parties lack a legally cognizable interest in the outcome of the action.[9] The central question in a mootness analysis is whether changes in circumstances have forestalled any occasion for meaningful relief.[10] A moot case is subject to dismissal.[11]

Here, it matters not that Creighton eventually changed its policy regarding vaccines. We have held that a "'suit that seeks damages for harm caused by past practices is not rendered moot by the cessation of the challenged conduct.'"[12]

---

[7] Brief for appellee at 25.

[8] *City of Hastings v. Sheets*, 317 Neb. 88, 8 N.W.3d 771 (2024).

[9] *Id*.

[10] *Id*.

[11] *Id*.

[12] *Rath v. City of Sutton*, 267 Neb. 265, 274, 673 N.W.2d 869, 880 (2004).

In addition, we have made clear that mere voluntary cessation of allegedly unlawful conduct is insufficient to render an action moot. "If voluntary cessation of that kind rendered a case moot, 'a defendant could engage in unlawful conduct, stop when sued to have the case declared moot, then pick up where he left off, repeating this cycle until he achieves all his unlawful ends.'"[13] Accordingly, we conclude that the matter is not moot and proceed to the substance of the appeal.

## 2. Dismissal for Failure to State Claim

Broadly, the students assign that the district court improperly dismissed all the allegations in their complaint, finding that they had failed to state a claim on any of their causes of action. The students contend that they have adequately pled the necessary elements on each of their claims. Creighton counters that the district court did not err, and that all the claims are insufficient to withstand a motion to dismiss.

### (a) Principles Guiding Analysis of Motion to Dismiss for Failure to State Claim

Civil actions are controlled by a liberal pleading regime; a party is required to set forth only a short and plain statement of the claim showing that the pleader is entitled to relief and is not required to plead legal theories or cite appropriate statutes so long as the pleading gives fair notice of the claims asserted.[14] The rationale for a liberal notice pleading standard in civil actions is that when parties have a valid claim, they should recover on it regardless of failing to perceive the true basis of the claim at the pleading stage.[15]

---

[13] See *Stewart v. Heineman*, 296 Neb. 262, 297, 892 N.W.2d 542, 565 (2017). Accord *Nesbitt v. Frakes*, 300 Neb. 1, 911 N.W.2d 598 (2018).

[14] *Edwards v. Estate of Clark*, 313 Neb. 94, 982 N.W.2d 788 (2022).

[15] *Id*.

[7,8] To prevail against a motion to dismiss for failure to state a claim, a plaintiff must allege sufficient facts, accepted as true, to state a claim to relief that is plausible on its face.[16] A motion to dismiss should be granted only in the unusual case in which a plaintiff includes allegations that show on the face of the complaint that there is some insuperable bar to relief.[17]

#### (b) Breach of Implied Contract

We turn first to the students' claim that they have stated a valid claim for breach of contract. The students concede that there is no express contract at issue. Instead, they allege that the parties are bound by an implied contract based on Creighton's offer to educate the students in exchange for the students' completion of enrollment forms and payment of tuition. The students allege that Creighton then breached this implied contract by adding a requirement that students be vaccinated against COVID-19, without providing additional consideration.

Creighton, however, counters that there is no implied contract between the parties for several reasons. First, it asserts that its student handbook, which provides that none of its policies or procedures should be seen as creating a contract between Creighton and its students, precludes the possibility of an implied contract. Second, citing case law from various jurisdictions, Creighton argues that even if such a contract exists, universities are permitted to impose vaccination requirements, and that it explicitly reserved such a right in its student handbook. Lastly, Creighton contends, again, that if such a contract exists, the EUA waivers must be incorporated into the contract, as well. From that perspective, it argues that the students breached the contract by not being vaccinated

---

[16] *Nieveen v. TAX 106*, 317 Neb. 425, 10 N.W.3d 365 (2024).

[17] *Trausch, supra* note 2.

by the appointed deadline, thereby justifying Creighton's decision to unenroll them.

We agree with the students and conclude that they have alleged a claim for a breach of an implied contract.

[9-11] An implied contract arises where the intention of the parties is not expressed in writing but where the circumstances are such as to show a mutual intent to contract.[18] The determination of the parties' intent to make a contract is to be gathered from objective manifestations—the conduct of the parties, language used, or acts done by them, or other pertinent circumstances surrounding the transaction.[19] If the parties' conduct is sufficient to show an implied contract, it is just as enforceable as an express contract.[20] As a general matter, the terms of an implied contract are a question of fact to be determined by the jury based on the evidence presented.[21]

This court has before recognized that the relationship between a university and its students is often contractual in nature. Such was the case in *Armstrong v. Clarkson College*,[22] a case in which we determined that an implied contract existed between a college and one of its students regarding the college's obligation to provide the student a clinical site. There, we determined that the contract had not arisen from the handbook, which expressly disclaimed the formation of any contractual relationships and reserved to the college the unilateral power to modify the handbook.[23] Instead, we found that the contract had been created at the time of enrollment

---

[18] *Moore v. Nebraska Acct. & Disclosure Comm.*, 310 Neb. 302, 965 N.W.2d 564 (2021).

[19] *Id*.

[20] *Id*.

[21] *Armstrong v. Clarkson College*, 297 Neb. 595, 901 N.W.2d 1(2017).

[22] *Id.*

[23] *Id*.

by the student's conduct of accepting the college's offer of enrollment, which included the college's promise to provide the student with a site to complete clinical work as part of its program.[24]

Other jurisdictions have come to the same conclusion.[25] For example, in *Kashmiri v. Regents of University of Cal.*,[26] the California Court of Appeal concluded that a university had an implied contractual obligation not to raise its fees during the course of its students' enrollment, because such had been promised to the students at the time of their admission and because the same was reflected on the university's website and in its catalogs. As in *Armstrong*, the court concluded that the contract was formed by "'"the act of matriculation, together with [the] payment of required fees."'"[27] As such, the policies, handbooks, or catalogs were relevant only to the extent they defined the terms of the implied contract but were not necessarily relevant to its creation.[28]

Based on these principles, the issue to be determined in our review of the motion to dismiss is whether the students have adequately alleged conduct that would create an implied

---

[24] *Id*.

[25] See, *McCudden v. Canisius Coll.*, 236 A.D.3d 1441, 230 N.Y.S.3d 492 (2025) (recognizing that nature of relationship between university and student is contractual, but concluding that complaint at issue was too conclusory to state valid claim for breach of contract); *Univ. of Miss. Med. Center v. Hughes*, 765 So. 2d 528 (Miss. 2000) (concluding that although relationship is contractual in nature, university retains right to change academic degree requirements). See, also, *Corso v. Creighton University*, 731 F.2d 529 (8th Cir. 1984) (reaching same conclusion regarding status of student-to-university relationship at federal level; case, however, involved express rather than implied contract).

[26] *Kashmiri v. Regents of University of Cal.*, 156 Cal. App. 4th 809, 67 Cal. Rptr. 3d 635 (2007).

[27] *Id*. at 824, 67 Cal. Rptr. 3d at 646 (quoting *Andersen v. Regents of University of California*, 22 Cal. App. 3d 763, 99 Cal. Rptr. 531 (1972)).

[28] *Kashmiri v. Regents of University of Cal., supra* note 26.

contract. The specific terms of such an agreement need not be determined by this court at this point.

Based on our review of the complaint and the conduct of the parties alleged therein, we cannot conclude that the students have failed to state a claim. Specifically, the students in this case allege that an implied contract existed between Creighton and its students, which *Armstrong* and *Kashmiri* make clear is a cognizable claim. In fact, the case at bar is substantially similar to the cases discussed above. As in *Kashmiri*, this contract is alleged to have arisen from Creighton's conduct of offering to educate the students in return for the students' conduct of enrolling at the university and paying tuition. The complaint details that Creighton then breached this contract by unilaterally modifying the agreement to require the students to be vaccinated against COVID-19, by refusing to permit the students to finish their semester that had already begun, and by prohibiting the students from accessing their transcripts. The complaint explains that this conduct violates "CU policy 2.1.25" and the antidiscrimination policy located in "paragraph Z" of Creighton's student handbook. These allegations are sufficient. It is sufficient that the students allege that the parties' conduct created a contract and that the contract has been breached.

We do, nonetheless, acknowledge Creighton's assertion that the complaint does not include, beyond that detailed above, much information regarding the terms of this implied contract. That, however, is not fatal to the students' claim. As stated above, it is not for this court, in reviewing a motion to dismiss for failure to state a claim, to identify the precise terms of the implied contract. We leave such a determination to a fact finder. Accordingly, Creighton's arguments that to the extent the parties reached any implied contract, such contract allowed Creighton to impose additional vaccine requirements, and that the students additionally agreed to be vaccinated pursuant to the EUA waivers, are premature and irrelevant to our current review.

Therefore, drawing all reasonable conclusions in favor of the students, we conclude that they have stated a claim for relief based on a breach of an implied contract, and the district court erred in finding to the contrary.

### (c) Violation of Due Process

[12] In their complaint, the students also allege that Creighton violated their due process rights. Their allegations seem to be based on the notion that Creighton provided no grievance procedure for challenging the vaccination requirement. Although the students' brief generally assigns that the district court erred in dismissing their claims, there is no specific mention of, or argument related to, this claim in the students' brief on appeal, and their reply brief did not counter Creighton's argument that this claim had been abandoned. We have consistently stated that alleged errors of the lower court must be both specifically assigned and specifically argued in the brief of the party asserting the errors to be considered by an appellate court.[29] Accordingly, we agree that the students have abandoned this claim.

### (d) Conversion

The students' third cause of action is one for conversion.

By way of additional background, once enrolled at Creighton, students were required to sign a "Statement of Financial Responsibility," agreeing that if they failed to pay any moneys owed to Creighton, the university would place a hold on their accounts, preventing the students from registering for classes and housing, obtaining transcripts, or receiving a diploma. Accordingly, when the students were withdrawn from Creighton, a hold was placed on some of their student accounts and records. As a result, some students, although the complaint does not allege which ones, were unable to access

---

[29] *State v. Goynes*, 318 Neb. 413, 16 N.W.3d 373 (2025).

their transcripts despite the fact that the students had paid all tuition and fees up until the fall 2021 semester.

The students assert that Creighton's hold prevented them from being able to register for classes at Creighton or to transfer their credits to another university. Therefore, the students also assert that this "constituted unauthorized and wrongful dominion" over their personal property and resulted in a denial of their right to said property. The students rely on principles of forfeiture, particularly the notion that a forfeiture will not be found in the construction of a contract absent an explicit provision. Although not entirely clear, it seems to be the students' position that, because the statement of financial responsibility contains no express forfeiture clause, its enforcement would result in an improper forfeiture of the students' credits. Creighton counters that the students do not possess any ownership interest in their transcripts or previous credits, and that because the students had not yet paid for the fall 2021 semester, Creighton was permitted to place a hold on their accounts.

[13,14] Conversion is any unauthorized or wrongful act of dominion exerted over another's property which deprives the owner of his property permanently or for an indefinite period of time.[30] In an action for conversion, the plaintiff must allege facts showing a right to immediate possession of the property at the time of the conversion.[31]

The parties do not direct us to any cases in which we have discussed whether students have a property right in school records or transcripts, and we are not aware of any such cases. Other jurisdictions have considered the matter with mixed results. Some states have declined to find that such an interest

---

[30] *Peterson v. Homesite Indemnity Co.*, 287 Neb. 48, 840 N.W.2d 885 (2013).

[31] *Prososki v. Commercial Nat. Bank*, 219 Neb. 607, 365 N.W.2d 427 (1985).

exists,[32] while other states have found that such an interest does exist.[33]

Based on our set principles of conversion, we conclude that the students have stated a plausible claim for relief such that they can overcome a motion to dismiss. The operative complaint alleges that the students maintain a personal interest in their transcripts and credits because they earned the credits and paid for such credits, that the school exercised wrongful control over those transcripts and credits, and that the students were damaged by such wrongful control.

As such, the district court erred in dismissing this claim.

### (e) Negligence and NCPA

Finally, the students assert that Creighton was negligent in its administration of the vaccine and that, in its negligence, it also violated the NCPA. It is the contention of the students that neither of these claims is barred by the federal Public Readiness and Emergency Preparedness Act (PREP act).

More specifically, the students allege that in requiring and administering the vaccine, Creighton had a duty to follow the Centers for Disease Control and Prevention guidelines, and that those guidelines required that certain disclosures be made and that a process for obtaining written informed consent be followed prior to the administration of a vaccine. They further

---

[32] See, *Juras v. Aman Collection Service, Inc.*, 829 F.2d 739 (9th Cir. 1987) (concluding that university, and not student, is owner of transcript, because university creates, maintains, and possesses grade record and excludes all except student from accessing it, and finding, instead, that student had right only of access rather than ownership); *McKee v. Southfield School*, 613 So. 2d 659 (La. App. 1993) (finding that child, as third-party beneficiary of contract between parent and school, was not entitled to access his transcript absent payment of tuition).

[33] *Doe v. University of Michigan*, 78 F. 4th 929 (6th Cir. 2023) (concluding that student had standing to challenge act of university placing hold on his account, because hold caused injury to student); *In re Kuehn*, 563 F.3d 289 (7th Cir. 2009) (concluding that student had state-law right, based on custom, to receive certified copy of her transcript).

allege that Creighton failed either to provide the disclosures or to receive informed consent from the students on campus. In doing so, the students contend that this amounted to an "unfair [and] deceptive business practice."[34] It also seems to be the contention of the students that Creighton's duty applied to all students regardless of whether they received the vaccine, therefore indicating that these claims are not exclusive to Hultgren, the only student-appellant to receive the vaccine.

### (i) Negligence

Turning first to the students' negligence claim, we find that even assuming the students could allege a state law negligence claim, it would be preempted by the PREP act.

The PREP act was enacted in 2005 and provides:

> [A] covered person shall be immune from suit and liability under Federal and State law with respect to all claims for loss caused by, arising out of, relating to, or resulting from the administration to or the use by an individual of a covered countermeasure if a declaration under subsection (b) has been issued with respect to such countermeasure.[35]

In relevant part, the PREP act defines a covered person as "(iv) a qualified person who prescribed, administered, or dispensed such countermeasure."[36] A covered countermeasure is defined as "(A) a qualified pandemic or epidemic product,"[37] meaning a "drug," "biological product," or "device" "designed . . . to diagnose, mitigate, prevent, treat, or cure a pandemic or epidemic"[38] and "(C) a drug . . . , biological product . . . , or device . . . that is authorized for emergency use."[39]

---

[34] Brief for appellants at 26.

[35] 42 U.S.C. § 247d-6d(a)(1) (2018 & Supp. V 2023).

[36] 42 U.S.C. § 247d-6d(i)(2)(B).

[37] 42 U.S.C. § 247d-6d(i)(1).

[38] 42 U.S.C. § 247d-6d(i)(7).

[39] 42 U.S.C. § 247d-6d(i)(1)(C).

Finally, "'loss' means any type of loss, including . . . (i) death; (ii) physical, mental, or emotional injury, illness, disability, or condition; (iii) fear of physical, mental, or emotional injury, illness, disability, or condition, including any need for medical monitoring; and (iv) loss of or damage to property, including business interruption loss."[40]

In lieu of a cause of action, the PREP act created the "'Covered Countermeasure Process Fund'" to compensate individuals who are harmed by the administration or use of a covered countermeasure.[41] The PREP act does, also, provide an exclusive cause of action for claims of wrongful misconduct.[42]

Based on the federal statutory language, then, for a party's claim to be preempted by the PREP act, it must be that the offending party is a covered person, who administered a covered countermeasure, and that the countermeasure caused the loss to the other party. Neither party disputes that Creighton's vaccine policy caused the alleged harm to the students. As such, we need determine only whether the first two elements are present.

### a. Creighton Is Covered Person Administering Covered Countermeasure

The students argue that the PREP act is inapplicable because Creighton is neither a covered entity nor an entity who administered a covered countermeasure and, therefore, does not meet the requirements to receive PREP act immunity. As such, before determining whether the students' claims are preempted, we assess whether Creighton was a covered person administering a covered countermeasure. We note that at the time Creighton imposed its vaccine mandate, a declaration, as contemplated by the act, was in effect, providing

---

[40] 42 U.S.C. § 247d-6d(a)(2)(A).

[41] 42 U.S.C. § 247d-6e(a) (2018).

[42] See, e.g., 42 U.S.C. § 247d-6d(d)(1).

immunity to qualified entities such that it would be possible for Creighton to receive immunity.

We conclude that Creighton is a covered person. The students concede as much in their complaint when they say, "[Creighton] employed physicians materially participating in supervision or administration of a program with respect to the administration, dispensing, distribution, provision, or use of the vaccines on [Creighton's] campus." That same allegation cites to relevant portions of the PREP act. The students attempt to retract this concession in their brief on appeal, but even absent a concession, such a conclusion is still supported by the statutory language.

As explicitly alleged in the complaint, Creighton's chosen method of combatting the COVID-19 pandemic was to require and administer the COVID-19 vaccine on its campus through physicians specifically authorized to do so. In doing so, Creighton became a "qualified person who prescribed, administered, or dispensed such countermeasure."[43] Additionally, by administering the vaccine, Creighton was administering a covered countermeasure. Administering a vaccine intended to help prevent or slow the spread of an illness, in this case COVID-19, is plainly within the statutory definition of a covered countermeasure. This is true regardless of whether the vaccine was experimental, or FDA approved, as both are included in the act.

### b. Students' Negligence Claim Is Preempted by PREP Act

The students also argue that even if Creighton receives some immunity under the PREP act, the act does not preempt state law claims for negligence and therefore provides no immunity against their claims.

Nebraska has not yet had an occasion to comment on the PREP act or to what extent state law claims may be preempted

---

[43] See 42 U.S.C. § 247d-6d(i)(2)(B)(iv).

thereby. The students urge us to rely on federal cases like *Saldana v. Glenhaven Healthcare LLC*.[44] There, the court assessed whether the PREP act was a complete preemption statute and concluded that it was not.[45] Specifically, the court determined that the act did not create an exclusive cause of action for state law claims.[46] Instead, the court noted that the act created a cause of action only for willful misconduct, meaning only state law claims for willful misconduct were preempted.[47] Therefore, the court concluded that there was no basis for federal question jurisdiction, since the state law claim remained.[48] The students cite other federal cases to the same effect.[49]

We do not find *Saldana* to be persuasive. *Saldana*, as with many of the other cited cases, is procedurally distinct from the matter before this court. The underlying question in those cases was whether removal from state court to federal court was appropriate when, based on the face of the complaint, the claim was grounded in state law and presented no federal question. That is not the issue before us.

A more procedurally analogous, and more persuasive, case is *Happel v. Guilford Cnty. Bd. of Educ.*,[50] decided by the North Carolina Supreme Court. There, on a motion to dismiss, the court considered whether a litigant's state constitutional and tort-based claims were preempted by the PREP act

---

[44] *Saldana v. Glenhaven Healthcare LLC*, 27 F.4th 679 (9th Cir. 2022).

[45] *Id.*

[46] *Id*.

[47] *Id*.

[48] *Id*.

[49] See, *Walsh v. SSC Westchester Operating Co. LLC*, 592 F. Supp. 3d 737 (N.D. Ill. 2022); *Yarnell v. Clinton No. 1, Inc.*, 591 F. Supp. 3d 432 (W.D. Mo. 2022).

[50] *Happel v. Guilford Cnty. Bd. of Educ.*, 387 N.C. 186, 913 S.E.2d 174 (2025).

and concluded that a battery claim fell squarely within the act and, therefore, was preempted by the act.[51]

The North Carolina high court concluded that Congress did not preempt state constitutional claims, because to do so would eliminate any recourse for nonwillful constitutional violations except through the Covered Countermeasure Process Fund.[52] Such a situation, the court reasoned, would, effectively, incentivize unconstitutional behavior by eliminating enforcement mechanisms.[53] Additionally, in its statutory analysis, the court focused[54] on the fact that the PREP act specifies that any "claims for loss" are preempted.[55] Based on the plain language of the PREP act's definition of "loss," which is defined by four examples of various types of harm,[56] the court concluded that those sorts of harms, or losses, could occur only in the context of a tort.[57] As such, it held that the plain language of the provision preempted state law tort-based claims.[58] Accordingly, noting that constitutional loss is substantially different from tort loss, the court held that only the litigant's battery claim was preempted.[59]

In *Parker v. County Public Health Dept.*,[60] a New York appellate court reached the same conclusion, deciding that a claim based on a lack of consent was a "'claim for loss'" as contemplated by the PREP act. In arriving at this

---

[51] *Id.*

[52] *Id.*

[53] *Id.*

[54] *Id.*

[55] See 42 U.S.C. § 247d-6d(a)(1).

[56] See 42 U.S.C. § 247d-6d(a)(2)(A).

[57] *Happel v. Guilford Cnty. Bd. of Educ., supra* note 50.

[58] *Id.*

[59] *Id.*

[60] *Parker v. County Public Health Dept.*, 102 A.D.3d 140, 143, 954 N.Y.S.2d 259, 262 (2012).

conclusion, the court also reasoned that "'claim[s] for loss'" are typically vindicated through an award of damages anyway, making the Covered Countermeasures Process Fund an appropriate remedy.[61]

We find *Happel* and *Parker* to be persuasive, and we rely on the reasoning therein. In doing so, we conclude that the students' claims, both Hultgren's and those of the other students, are, in fact, preempted by the PREP act. As already mentioned, the students do not allege any constitutional claims and, instead, allege claims for negligence based on a lack of disclosures and failure to receive informed consent. A claim for negligence, as explained in *Happel* and *Parker*, is a tort claim and, therefore, is a claim for loss based on the plain language of the statute. In fact, just as in *Parker*, the students' negligence claims are based, at least in part, on a lack of consent. To the extent the students seek monetary damages for Creighton's alleged negligence, Congress' statutory remedy, the Covered Countermeasure Process Fund, provides similar recourse and was designed specifically for situations such as this. Therefore, we conclude that the district court did not err in concluding that none of the students could state a claim for negligence.

### (ii) Students Cannot State Claim
### for Violation of NCPA

Next, we turn to the students' claim for violations of the NCPA. As mentioned above, the students argue that Creighton's lack of disclosures and failure to obtain informed consent amounted to "unfair or deceptive business practices," because students were not made fully aware of the type, risks, and benefits of receiving the vaccine.[62] Creighton counters that the situation at issue is not governed by the NCPA and that the students' interpretation of the statutory language is overly broad.

---

[61] *Id.*

[62] Brief for appellants at 25.

[15,16] The NCPA was intended to be an antitrust measure to protect Nebraska consumers from monopolies and price-fixing conspiracies.[63] The purpose of the NCPA is to provide consumers with protection against unlawful practices in the conduct of any trade or commerce which directly affects the people of Nebraska.[64]

In making their argument, the students specifically rely on § 59-1602, which provides that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce shall be unlawful." Section 59-1601 provides that "[t]rade and commerce shall mean the sale of assets or services and any commerce directly or indirectly affecting the people of the State of Nebraska." The students contend that Creighton's provision of educational services would fall within this definition.

In this matter, any violations of the NCPA were causally related to Creighton's administration of a covered countermeasure. As such, the PREP act preempts the students' cause of action concerning the NCPA and the district court did not err in dismissing the claim.[65]

### 3. District Court Did Not Err in Refusing to Allow Motion to Amend

[17,18] The students also assign and argue that the district court erred in denying their motion to amend their complaint. Generally, where leave to amend is sought before discovery is complete and before a motion for summary judgment has been filed, leave to amend should be denied as futile only if the proposed amendment cannot withstand a motion to

---

[63] *Salem Grain Co. v. Consolidated Grain & Barge Co.*, 297 Neb. 682, 900 N.W.2d 909 (2017).

[64] *Arthur v. Microsoft Corp.*, 267 Neb. 586, 676 N.W.2d 29 (2004).

[65] See *M.T. v. Walmart Stores, Inc.*, 63 Kan. App. 2d 401, 528 P.3d 1067 (2023) (review denied on August 25, 2023).

dismiss under § 6-1112(b)(6).[66] However, leave to amend should not be granted when it is clear that the defect cannot be cured by amendment.[67]

Based on our analysis above, we determine that the students' claims as to negligence and violation of the NCPA are unable to be remedied through an amendment because Creighton is a covered person administering a covered countermeasure and these claims cannot be maintained against them. As a result, we conclude that the district court did not abuse its discretion in declining the students' request to file an amended complaint.

## VI. CONCLUSION

For the reasons outlined above, we conclude that the students have sufficiently stated a claim for breach of an implied contract and conversion. However, as to the students' negligence and NCPA claims, we conclude that they have failed to state a claim, and that any amendment to such claims would be futile because the defects in the claims cannot be remedied. As to the students' due process claim, we conclude that they have abandoned this issue. Accordingly, we reverse the district court's decision and remand the cause for further proceedings on the breach of contract and conversion claims but otherwise affirm the district court's decision on all other matters.

Affirmed in part, and in part reversed and remanded for further proceedings.

---

[66] *Trausch, supra* note 2.

[67] *Id.*