IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


OLSON V. OLSON


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


RANDY L. OLSON AND PATRICIA A. OLSON, HUSBAND AND WIFE, APPELLEES,

V.

SCOTT L. OLSON AND SUSAN B. OLSON, HUSBAND AND WIFE, APPELLANTS.

V.

PHYLLIS OLSON, AN INDIVIDUAL, INTERVENOR/APPELLANT.


Filed May 5, 2026.    No. A-25-388.


Appeal from the District Court for Burt County: ZACHARY L. BLACKMAN, Judge. Affirmed.

David V. Drew, of Drew Law Firm, P.C., L.L.O., for appellants.

Jeffrey C. Jarecki and Kent R. Olson, of Jarecki Sharp & Petersen, P.C., L.L.O., and Keith A. Harvat, of Houghton Bradford Whitted, P.C., L.L.O., for appellees.


RIEDMANN, Chief Judge, and BISHOP and WELCH, Judges.

WELCH, Judge.

### INTRODUCTION

Scott and Susan Olson (Appellants) appeal from the Burt County District Court's order granting Randy and Patricia Olson's (Appellees) complaint seeking to partition several tracts of land co-owned by the parties. Appellants generally assert that the district court erred in adopting the referee's report for purposes of the partition. For the reasons stated herein, we affirm.

- 1 -

## STATEMENT OF FACTS

### BACKGROUND

The parties co-own, as tenants in common, 20 parcels of real property, approximately 2,900 acres, located in Burt County, Nebraska. The parties use these parcels to conduct various farming operations. The parties formerly built two residences on a 66.04 acre tract of land on one of the parcels. Appellants resided in one residence and Scott and Randy's mother, Phyllis Olson, resided in the other. The record refers to that "unit" of land on one of the parcels as the "Olson 2-Home Acreage."

The real property and farming operation was broken down into three different use types. The first use type consisted of land farmed by Randy and Scott. The second use type consisted of land that was placed in the Conservative Reserve Program (CRP). The third use type consisted of land leased by the parties to Lee Valley, Inc., in which Randy and Scott were both shareholders. Prior to the action, Appellants and Appellees shared expenses, crop production, and CRP payments equally, and each individually marketed their 50 percent share of crop production.

### COMPLAINT AND COUNTERCLAIM

In March 2022, Appellees filed a complaint in the Burt County District Court requesting a declaratory judgment, partition of the 20 co-owned tracts of land, and injunctive relief. The complaint alleged that the parties each owned, as tenants in common, an undivided one-half interest in the 20 parcels of real property. The complaint asserted that Randy and Scott were siblings, and together with their spouses, they purchased the respective tracts of land and engaged in farming operations.

Appellees alleged that beginning in 2021, the parties began having disagreements because Appellants' son was submitting hours on his timesheet that he did not actually work. Appellees alleged that Appellants' demeanor and behavior towards them became aggressive and combative and that Appellants engaged in a pattern of yelling, name-calling, foul language, insults and ridicule, in addition to attempting physical harm. As a result, Appellees distanced themselves from the parties' farming operation and continued work in a separate space. Appellees alleged that the disagreements and the escalating incidents between the parties made continued co-ownership of the property impracticable and potentially dangerous for those involved. Appellees requested that the court enter declaratory judgment declaring that the 20 parcels of land were co-owned by the parties as tenants in common and that Appellees had a legally enforceable ownership interest in the real property. Appellees requested a partition of the 20 parcels of land and injunctive relief to prevent Appellants from engaging in actions to decrease the fair market value of the real property.

In their answer and counterclaim, Appellants admitted co-ownership in the 20 parcels of land and asserted that they were entitled to have their interest in the parcels confirmed and partitioned according to law.

At some point following the filing of the pleadings, the parties sold one parcel, and therefore only 19 parcels remained subject to partition thereafter.

ORDER CONFIRMING OWNERSHIP INTERESTS AND PARTITION

In August 2022, the district court entered an order confirming the parties' co-ownership of the parcels and ordered the partition of those shares and interests. The court appointed three referees to serve in this case: Scott Henrichsen of Hertz Farm Management, Grant Fitzgerald of Farmers National Company, and Bradley D. Holtorf of Sidner Law. The referees were tasked with determining whether a partition of the real estate was proper and with providing information and an analysis of how the real estate should be allotted while considering that the ownership interests should be nearly equal between the parties; with determining whether any of the real estate was unable to be conveniently partitioned and should be sold; and with providing a summary regarding encumbrances against the real estate.

REPORT OF REFEREES

The referees' report was filed in January 2023. The 19 individual parcels of land were combined and labeled into the following 17 separate "units":

- Coe 80
- Decatur
- Duck Lake
- Elmers 80
- Hundahl
- Lee Valley
- Mangold QTR
- Maxine + Ray's Crop Acre
- Olson 2-Home Acreage
- Moore North Farm
- Moore South Farm
- Miles
- Olson Hill Farm
- Olson House Farm
- Olson 160
  Qtr. West of Homes    East Fields
- River Farm
- Ray's 40, East of Ditch

The referees ultimately determined that all the real estate could be partitioned in-kind. The referees determined the parties' respective shares, the valuation, and the proposed method of partition.

MOTION TO INTERVENE

In June 2023, Phyllis filed a petition to intervene in the action, claiming an interest in the Olson 2-Home Acreage. The court granted Phyllis' motion to intervene "based upon the representation of [Phyllis'] leasehold interests."

PRETRIAL MOTIONS RELATED TO OLSON
2-HOME ACREAGE OWNERSHIP INTERESTS

In November 2024, Appellants sought to amend their answer and counterclaim as it related to their interests in the Olson 2-Home Acreage unit insofar as the "improvements [in] which [Appellees] have no interest." The district court denied the motion, finding that allowing the amendment would change the Appellants' position on ownership interests admitted in their original pleading, that the court already relied on the Appellants' judicial admissions contained in that pleading when confirming the parties' co-ownership interests in the court's August 2022 order, and that allowing the amendment would unfairly prejudice Appellees.

Appellants also filed a motion in limine seeking to clarify whether, at trial, Appellees were entitled to contest Appellees' interest in improvements on the Olson 2-Home Acreage or, in the alternative, a motion to vacate the court's August 2022 order confirming Appellees' co-ownership

in the improvements on the Olson 2-Home Acreage. Appellees objected to both motions asserting that the parties' ownership interests were determined in a final order entered by the court on August 22, 2022, and that no appeal had been taken from that order.

The district court denied Appellants' motion in limine and/or motion to vacate the court's August 2022 order confirming the interests in the property on the basis that its August 2022 order was a final appealable order that was not appealed and that Appellants and Phyllis had waited until "nearly two and a half years to request that [the order] be vacated, on the eve of the partition trial."

TRIAL

A trial was held over 3 days in January 2025. Testimony was adduced from witnesses including Randy, Scott, Susan, and Phyllis; referees Henrichsen, Fitzgerald, and Holtorf; and Eric Hansen, an accountant. Their testimony will be discussed in more detail in the analysis section below.

DISTRICT COURT'S DECREE OF PARTITION

In May 2025, the district court entered a decree of partition. The court, in discussing the referees' report, stated that, in addition to considering that the parties spent a lifetime building the farming operation and each party's preference list of units they wanted to receive,

> [t]he Referees considered several factors when determining how to divide the property, including soil type, irrigated versus nonirrigated, percentage of land that is farmable, improvements, and preferences of the parties. Soil type was considered because the quality of the soil matters for both productivity and value. Irrigation status is also an important factor because it reduces a farmer's risk by taking consistency of rain and the weather out of the picture. The Referees added a 20% premium to the value of the irrigated acres. The percentage of land that is farmable was also a factor. Improvements that are located on the parcels were considered because improvements affect the ease of farming those parcels.
>
> As the Referees testified, one additional factor that was considered was the location of the parcels and whether certain parcels were farmed together. This case involves two brothers who previously farmed all the subject land together. Due to the nature of the split between the parties, certain parcels should be awarded together to minimize contact between the brothers and ensure efficiency for continued farming.

The district court adopted the referees' report subject to modifications in value for the Miles and Lee Valley units and subject to the parties' joint stipulation that modified certain valuations contained in the referees' report.

The district court valued the Olson 2-Home Acreage at $1,445,828, pursuant to the parties' stipulation. The court noted that the parties agreed that the Olson 2-Home Acreage was to be awarded to Appellants and that Appellants would owe Appellees an owelty for half of its value.

The district court determined that the values of the Miles unit and the Lee Valley unit should be increased to account for the portions of those units that were being utilized, or could be utilized, as irrigated land instead of dry land.

As it related to the River Farm unit, the district court declined Appellants' request to modify the valuation of the recreational ground on that unit and found that the referees' testimony and report regarding why it was assigned as having no value was more credible than Scott's testimony that it had value, and that awarding a portion of the River Farm unit to Appellants and creating a partition for Appellees' use would be contrary to the goals of the partition process.

As it related to Phyllis' leasehold interest on the Olson 2-Home Acreage, the court found that whatever agreement that existed related to that property violated the statute of frauds but, because neither party wanted Phyllis removed from her home, the court utilized its equitable powers to impose a lease for the duration of Phyllis' life. The court declined to adjust the value of the Olson 2-Home Acreage because there was inadequate evidence to show the effect of how Phyllis' lease for the remainder of her lifetime affected the value of her home.

Finally, the district court partitioned the parties' interests, awarding Appellees the following parcels: Parcels 4 and 5 (Olson Qtr./Olson 160); Parcel 9 (Coe 80); Parcels 10, 11 and 12 (Decatur); Parcel 17 (Moore South); and Parcels 19 and 20(River Farm). The court awarded Appellants: Parcel 2 (Hundahl); Parcel 3 (Lee Valley); Parcel 7 (Duck Lake); Parcel 8 (Miles); Parcel 13 (Mangold Qtr.); Parcel 14 (Elmers 80); Parcel 15 (Ray's 40); Parcel 16 (Maxine's 40); and Parcel 18 (Moore North). The court also awarded Appellees the Olson Hill Qtr./Olson West Qtr. with Appellants awarded the remainder of Parcel 1. The court ordered Appellants to pay Appellees an owelty of $732,637.82 to equalize the court's award of the Olson 2-Home Acreage to the Appellants. The court's order included the following chart which documented the division:

| RANDY OLSON | | 1099.60 | 1043.69 | $8,548,607.85 |
|---|---|---|---|---|
| | FARM NAME | ACRES | CROP ACRES | VALUATION |
| | RIVER FARM | 493.52 | 446.47 | $3,944,314.04 |
| | COE80 | 80.00 | 79.23 | $603,312.79 |
| | MOORE SOUTH | 152.57 | 152.90 | $1,557,242.77 |
| CRP | OLSON 160 | 160.00 | 160.00 | $1,043,796.91 |
| | OLSON QTR WEST OF HOUSES | 158.00 | 149.41 | $938,510.33 |
| | DECATUR | 55.51 | 55.68 | $461,431.01 |

| SCOTT OLSON | | 1124.79 | 1115.67 | $8,567,054.90 |
|---|---|---|---|---|
| | FARM NAME | ACRES | CROP ACRES | VALUATION |
| CRP | MANGOLD QTR | 160.00 | 160.00 | $1,073,103.50 |
| | LEE VALLEY | 115.69 | 115.69 | $1,005,877.91 |
| | ELMERS 80 | 80.00 | 75.57 | $577,050.43 |
| | OLSON HOUSE FARMS EAST FIELDS | 82.00 | 78.87 | $619,866.18 |
| CRP | HUNDAHL | 94.68 | 94.68 | $596,864.78 |
| | DUCK LAKE | 200.00 | 200.00 | $1,513,655.33 |

| | FARM NAME | ACRES | | VALUATION |
|---|---|---|---|---|
| | MILES | 232.52 | 232.52 | $1,761,689.00 |
| | MAXINE CROP | 60.88 | 59.82 | $421,674.43 |
| | MOORE NORTH | 76.49 | 76.49 | $853,788.71 |
| CRP | RAY'S CRP | 22.53 | 22.03 | $143,484.63 |
| | | | | |
| | | | | |
| | **FARM NAME** | **ACRES** | | **VALUATION** |
| | OLSON 2 HOUSE ACREAGE | 66.00 | | $1,446,828.00 |

| | TOTAL ACRES | | |
|---|---|---|---|
| | 2224.39 | | |
| | | | |
| VALUE VARIANCE | $18,447.05 | 50% | ($9,223.82) |
| TAXABLE ACRE VARIANCE | -25.19 | | |
| CROP ACRE VARIANCE | -71.98 | | |
| | | | |
| RANDY ACQUIRES 25.19 LESS TAXABLE ACRES AND 71.98 LESS CROP ACRES AND HIS VALUE IS $18,447.05 LOWER | | | |
| | | | |
| EACH BROTHER HAS A 50% OWNERSHIP STAKE IN **THE** 2 HOUSE ACREAGE | | | $723,414.00 |
| | | | |
| | | | |
| **FINAL CONCLUSION: SCOTT WOULD OWE RANDY:** | | | **$732,637.82** |

ASSIGNMENTS OF ERROR

Restated and renumbered, Appellants assign two general errors associated with the district court adopting the referees' report as modified and finding the proposed division of the land units described by the referees was equitable. First, Appellants assign and argue that the division of the land units failed to adequately consider the quality of soil and productivity of the land while assigning too much weight to the parties' preferences. Second, Appellants assign error to the value ascribed to four of the land units in the final division.

STANDARD OF REVIEW

A partition action is an action in equity and is reviewable by an appellate court de novo on the record. *FTR Farms v. Rist Farm,* 305 Neb. 708, 942 N.W.2d 204 (2020). In our de novo review of this question, we accord some deference to the district court. *Id.* In an appeal of an equity action,

where credible evidence is in conflict on a material question of fact, an appellate court considers and may give weight to the fact that the trial court heard and observed the witnesses and their manner of testifying and accepted one version of the facts rather than another. *Id.*

ANALYSIS

Before addressing the assigned errors, we briefly summarize the standard for partition actions.

The purpose of a partition action is to divide a jointly owned interest in real property so that each owner may enjoy and possess in severalty. *FTR Farms v. Rist Farm, supra.* This articulation differs little from its ancient precedent: The object of a partition suit is to assign property, the fee simple title to which is held by two or more persons as joint tenants, or tenants in common, to them in severalty. *Id.* Essentially, the purpose of partition is to provide owners with separate and exclusive possession of their portion of co-owned land. *Smith v. Smith,* 29 Neb. App. 607, 957 N.W.2d 511 (2021).

One of several tenants in common has an absolute right to a partition of their real estate, in the absence of an agreement to, or other impediments to, the contrary. *FTR Farms v. Rist Farm, supra.*

The partition statutes require a court to determine whether "partition cannot be made without great prejudice to the owners." *FTR Farms,* 305 Neb. at 716, 942 N.W.2d at 211. The generally accepted test of whether a partition in kind would result in great prejudice to the owners is whether the value of the share of each in case of a partition would be materially less than the share of the money equivalent that could probably be obtained for the whole. *Id.*

The partition statutes set up a series of statutorily mandated phases in order to achieve the partition of property. *Schlake v. Schlake*, 294 Neb. 755, 885 N.W.2d 15 (2016). Partition begins with the filing of a complaint in partition. *Id.* The parties then produce documentary proof showing their share, after which the district court shall render judgment "confirming those shares and interests, and directing partition to be made accordingly." *Id.*, 294 Neb. at 762, 885 N.W.2d at 20. At this point, the district court appoints up to three referees who compile a report on the property to be partitioned. *Id.*

Here, neither party disputes that a partition in kind was appropriate or that an owelty was owed between the parties. We, therefore, turn to the Appellants' claims that the district court erred in adopting the referees' report and finding that the referees' proposed division was equitable.

IMPROPER DIVISION BASED ON QUALITY OF LAND

Appellants first contend that the court erred in adopting the referees' report because "the Referees failed to consider . . . relevant factors when awarding the respective parcels based upon criteria which are not supported by law." Brief for appellants at 27. Appellants contend that the district court failed to consider that the referees' report inequitably provided Appellees with a majority of the quality soils; improperly considered each party's preference list; and did not consider soil types, irrigation, and productivity when dividing the income producing farms. Generally, Appellants acknowledge that the referees considered the factors when determining the value of the land but did not consider those factors when dividing the land between the parties.

Under Neb. Rev. Stat. § 25-2182 (Reissue 2016), "[f]or good and sufficient reasons appearing to the court, the referee or referees may be directed to allot particular portions of the land to particular individuals. In other cases the shares must be made as nearly as possible of equal value." *Id*. The statute is silent as to how the allotment determination is to be made apart from being "nearly as possible of equal value."

Testimony adduced from the referees indicated that, in valuing and dividing the various units, they considered, among other things, the amount of taxable and farmable acres, soil types, irrigated versus dry land, the maximum amount of CRP payments permitted to an individual, whether any particular parcels were farmed together as one unit, the parties' preference lists, and comparable sales. Henrichsen specifically testified that the referees did not generally consider the crop history or production history to value the parcels because different farmers and/or different farming techniques could impact that value. However, he testified that the referees attempted to divide the income-producing acres as equally as possible. There was no dispute that a better quality of soil may be more profitable than farms with lower quality soil and would generally produce higher bushels per acre. Henrichsen testified that the land was broken down into six different soil types, but the land was predominantly composed of four soil types.

The district court, in its August 2022 order, directed the referees to allot portions of the land between Appellants and Appellees as nearly as possible, so as to provide equal value. The referees subsequently combined the 19 parcels into 17 divisible units. The referees determined there were a total of 2,226.39 acres to be divided. In the court's division attached to the partition decree, it awarded Appellees 1,099.60 acres, which included 1,043.69 crop acres for a value of $8,548,607.85. The court awarded Appellants 1,124.79 acres, which included 1,115.67 crop acres for a value of $8,567,054.90. Appellants also received the Olson 2-Home Acreage, which consisted of 66 acres and two homes valued at $1,445,828.00. The district court found that Appellants owed Appellees an owelty of $732,637.82 to equalize that allocation. The district court adopted the referees' report as modified by certain stipulations of the parties and based on certain factual findings on the value of units.

In viewing the referees' report, the report contained, for each of the 17 divisible units, the total number of acres, the number of crop acres, whether the land was irrigated and the number of irrigated acres, whether the land was in CRP, and the specific number of acres by soil type. Both Appellants and Appellees were awarded CRP ground to avoid the maximum payment allotment under the program, and both were awarded nearly equal crop acres. Both parties received units with varying classification of soils, and the court complied with the parties' request that parcels typically farmed together be awarded together despite being separate parcels.

It is important to note that Appellants do not challenge the valuation methods used in determining the value of the land partitioned (save only certain limited valuation challenges discussed in the next section); that the land could be equitably divided without liquidation; or that any difference in value related to the Olson 2-Home Acreage awarded to Appellants could be reconciled through an owelty payment. Nor do they challenge that, generally speaking, the parties received nearly the same number of acres with each receiving varying degrees of soil types, irrigated land, and CRP land. Instead, Appellants argue that they received fewer acres with Class I and II soil than Appellees; that Appellants received more Class III and IV soils (which Appellants refer to as "Gumbo") than Appellees; that Appellants received less irrigated Class I and II soil than

Appellees; and that Appellants received less irrigated "Gumbo" soil than Appellees. In short, while Appellants do not take issue with the total value of the land each received in the final distribution (save only the limited value assignments discussed in the next section), they argue that the qualities of the properties partitioned renders the division inequitable notwithstanding an equal valuation. Appellants then propose a different allocation they claim would resolve the issue.

Appellants argue that, regardless of value, the topography of the land, number of acres, quality of soil, and productivity of the land are the primary considerations associated with partitioning the property citing *Trowbridge v. Donner*, 152 Neb. 206, 40 N.W.2d 655 (1950), and *Smith v. Smith*, 29 Neb. App. 607, 957 N.W.2d 511 (2021). But in both cases, the appellate courts cited to those factors in determining whether the properties could be divided in-kind without prejudice to the parties rather than being sold. Neither of those cases stand for the proposition that these factors should be separately considered when the properties can be equally divided based upon value.

Appellants do not assign error to the referees' recommendation and the court's order adopting an in-kind partition of the properties, nor do Appellants assign error on the basis that the division of units did not provide an equal monetary value in the land to them. Thus, there is some question of whether Appellants can separately challenge an in-kind distribution of equal monetary value on the basis of other equitable factors not mentioned in the statute. But, assuming without deciding, that it can, we find the division of property was not only equal in value but equitable in quality. In large measure, Appellants argue that the division was unfairly influenced by the parties' preferences provided to the referees at the referees' request. Appellants argue the referees were too reliant on their preference lists and we should disregard the parties' preferences in considering a true equitable division. And although they argue that the division was inequitable because Appellants received land with less Class I and II soil, with more "Gumbo" soil, and less irrigated land, the Appellees characterize the property division differently. Appellees argue that although they received more Class I and II soil, they received more Class IV and VI soil, which is inferior to the Class III soil that Appellants try to simply lump all together as "Gumbo." Further, Appellees contend that the amount of irrigated soil must be similarly analyzed by soil type. Although Appellees received more Class I and II irrigated soil, Appellants received more Class III irrigated soil. Further, Appellees received significantly less Class III and IV irrigated soil and less total irrigated soil. Taken together, when considering the values of all properties allotted, Appellees argue the division was equal and fair.

First, we reject the Appellants' request to have this court disregard their stated preference lists provided to the referees in advance of the partition at the referees' request. As the referees explained in their report, they did their best to honor both sides' requests for prioritized properties while considering multiple factors in making the final partition. Although Appellants explain their preference list was unfairly prejudicial to them because they prioritized properties they needed to retain for reasons other than agricultural value, they did, in fact, receive the two property units (Lee Valley and the Olson 2-Home Acreage) they prioritized by need, and the final collective partition resulted in nearly equal value to the parties.

Second, we recognize that in the final partition, each party received nearly an equal share in total acres, crop acres, and properties with a mixture of soil types and irrigation capacity. And as it relates to Appellants' claim that Appellees received land with more Class I and II soil than

Appellants and Appellants received more "Gumbo," Appellees counter that, generally speaking, Appellants received more total acres, more crop acres, and more irrigated acres than Appellees. And more specifically, when broken down, Appellees assert that, even though they received crop acres with more Class I and II soil, they also received more crop acres with Class IV and Class VI soil than Appellants, which is inferior to much of the land the Appellants' grouped into a category they call "Gumbo," and Appellants notably received more than twice the amount of land with Class III soil than Appellees. Further, with regard to Appellants' claim regarding irrigated soil, Appellees argue that the distinction is not unfair when irrigated soils of all types are considered and Appellants received more irrigated acres combined. We agree. Again, both parties received nearly an equal number of total acres and crop acres, and both received land with varying degrees of soil type and irrigation capacity. When factoring in the parties' preference lists, and the fact that the final partition resulted in nearly equal value to both parties when comparing the final distribution, we reject Appellants' contention that the final partition resulted in an inequitable division of land by quality.

VALUATION CHALLENGES

Appellants assign three errors associated with the valuation of certain units that were partitioned between the parties. The first challenges the court's equal allocation of the Olson 2-Home Acreage between Appellants and Appellees. The second challenges the court's valuation of the Miles and Lee Valley units. And the third challenges the value of the River Farm unit. We address those assignments independently.

Appellants first assign that the court rightly allocated the Olson 2-Home Acreage to Appellants, but the court erred in requiring Appellants to pay an owelty payment to Appellees for half of its entire value, not reduced by the value of Appellants' residential home located thereon. Appellants do not challenge the award of the Olson 2-Home Acreage to them, nor do they challenge the concept of equalizing the allocation by an owelty award. They simply argue that in awarding the owelty, the court erred in including the value of the home Appellants used as their primary residence on the basis that only Appellants contributed to the costs of building that home.

Appellants originally made this same claim to the district court in connection with a motion in limine/motion to vacate the district court's August 2022 order. And Appellants raised the same issue in the motion to amend its answer and counterclaim to clarify that their original answer did not intend to admit that improvements on the Olson 2-Home Acreage were equally owned. The district court denied all such motions on the basis that, in crafting its August 2022 order, it relied on Appellants' admission in their answer that all of the property listed in Appellees' complaint was co-owned and that changing that position now would unfairly prejudice Appellees. Further, the district court found the August 2022 order that resolved this issue was a final appealable order from which Appellants failed to timely appeal.

The matter eventually proceeded to a trial on the issue of partition, and the court entered its order adopting the referees' recommendations, subject to minor valuation adjustments, which order included an allocation of the Olson 2-Home Acreage to Appellants subject to an owelty for one-half of its value including the homes. That case went to trial on the pleadings as originally filed. On appeal, Appellants' assignments of error include a claim that the district court erred in evenly splitting the value of the Olson 2-Home Acreage between them. Notably, those assignments

- 10 -

do not include assigned errors associated with the court's August 2022 order, or Appellants' motions to vacate that order or to amend their answer thereafter. As we have often said, alleged errors of the trial court must be both specifically assigned and specifically argued in the brief of the party asserting the errors to be considered by an appellate court. *Ramaekers v. Creighton University*, 320 Neb. 478, 28 N.W.3d 57 (2025). So regardless of whether the August 2022 order constituted a final order, Appellants failed to assign error to any of the above-named orders wherein the court resolved this issue in favor of Appellees. Nevertheless, even if we found Appellants' assignment here was sufficient to present the issue on the merits, we reject it. We find the record reflects that the houses on the Olson 2-Home Acreage were originally constructed at the direction and cost of Lee Valley, Inc. And when the family accountant determined that funding of the homes by the corporation was improper, the accountant made journal entries on the corporate books to assign nearly equal shareholder loans to Appellants and Appellees for the costs of this construction, which were subsequently paid off by both Appellants and Appellees through payments and bonuses. As such, the record reflects that both parties contributed to building the homes and the evidence is simply insufficient to attribute more equitable value to Appellants. This assignment of error fails.

Appellants next contend that the district court erred in its final partition order in increasing the value of the Miles and Lee Valley units, over the amount included in the referees' initial report. Appellants assert that the court should not have considered evidence that a portion of the Miles and Lee Valley units, which the referees initially valued as dryland, had "the capacity to be irrigated and should therefore be valued as irrigated acres" because those issues were not pled in Appellees' responsive pleading.

After receiving the referees' December 2022 report, the parties agreed to contact the referees for clarification or adjustments on certain issues. Thereafter, the court entered an order indicating that "[c]ounsel cannot reach an agreement on Referee's Report and a hearing is necessary." In anticipation of the scheduled October 2023 trial, the court ordered the parties to file, on or before June 9, 2023, a notice/memo identifying the issues to be litigated during the trial including, but not limited to, whether either party disputed the proposed division in the referees' report; whether the parties agreed to a partition in kind for all the property; whether either party disputed or contested the valuations assigned; and any other specific adjustment to the proposed division. The parties timely filed "Responsive Pleadings" to the court's request. Appellants take issue with Appellees' failure to contest the valuation of Miles or Lee Valley in that response. But the trial did not take place in October 2023 due, at least in part, to the retirement of the district court judge who was previously assigned to this matter. In fact, the trial ultimately took place in late January 2025. It is noteworthy that the court's original June 2023 order, which was designed to frame the issues for the October 2023 trial, did not include language suggesting waiver or forfeiture of issues if not raised by that date.

On January 2, 2025, Appellees sent a letter to the referees inquiring into the valuation of Miles and Lee Valley. In response, the referees proposed an amendment to their original report which stated, in pertinent part:

> 3a. If the 65.41 acres are irrigated by a towable pivot on the Miles farm the total parcel value would be increased from $1,676,484 to $1,761,689. This is calculated by

increasing the value on 65.41 acres from dryland to irrigated which adds $1,302.63 per acre and totals an increase of $85,205.00.

3b. If the 30.13 acres are gravity irrigated on the Lee Valley parcel the total parcel value would be increased from $971,246.89 to $1,014,535.66. This is calculated by increasing the value on the 30.13 acres from dryland to irrigated which adds $1,324.22 per acre and totals an increase of $43,288.77. Note, 2.56 acres are located within the farm's building site and does not show any irrigation value so the value on these 2.56 acres were not valued at the irrigated amount per acre (area shown with teal border in image below).

Prior to the January 2025 trial, both parties provided pretrial briefs to the new judge assigned to the case, which framed the issues to be litigated. Appellees' pretrial brief included the issue of the referees' proposed amendment and contested the valuation of Miles and Lee Valley contained in the referees' initial report. Appellants did not object to the court's receipt of the referees' proposed amendment to their original report at trial. During Appellants' cross-examination of Henrichsen, Appellants adduced testimony that the referees used the word "if" in those two sections because they did not confirm whether the Miles unit had a towable pivot or whether the Lee Valley unit was gravity irrigated. However, Fitzgerald testified that it was the referees' recommendation to increase the value of the Miles and Lee Valley units because the evidence established that Miles was irrigated by the towable pivot and Lee Valley was serviced by a gravity irrigation system.

During Randy's testimony, he testified regarding the subject of the referees' proposed amendment. Appellants objected because Appellees did not take exception to the report as it related to those two subjects in their responsive pleading. The district court, in overruling Appellants' objection, stated:

I understand your objection with that part, but there has been some testimony from the referees with regard to these specific areas. I don't know what area exactly [Appellees' counsel] is going to be asking about. I can make some assumptions as to what he's going to ask questions about here, but for the time being, I'm going to overrule your relevance objection and allow him to get some testimony in. Ultimately, I understand where the issues are, and I will be making my determination based on what is or was not going to be their exceptions to the referees' report. So, I'm going to allow the testimony and I understand, but I will note it for the record.

Randy testified that the southern part of the Miles property had a towable pivot that moved back and forth between Miles and Duck Lake. Randy testified that if the Miles property were to be sold, it would be sold as irrigated land and therefore the value should be increased to so reflect. Randy also testified, over Appellants' objection, that the south side of the Lee Valley unit was gravity irrigated and that, beginning in 1976, the parties would lay pipe to water the entire 30.13 acres of Lee Valley. Randy testified that the Lee Valley unit could never have a circular pivot because it would not go around properly and would cost significantly more than to just keep the unit gravity irrigated. Randy testified that if the Lee Valley unit was sold, it would also be sold as an irrigated parcel. Scott acknowledged that there was a towable pivot that was shared between Duck Lake and Miles and did not dispute that a portion of Lee Valley was gravity irrigated.

In short, Appellants argue that Appellees waived the issue of the valuation adjustments proposed by the referees in their amendment to their original report because the issue was not framed as a trial issue in Appellees' June 2023 response to the court's order to provide notice or a memo identifying the issues to be litigated during the trial. In support of this claim, Appellants cite to *Spanish Oaks v. Hy-Vee*, 265 Neb. 133, 655 N.W.2d 390 (2003), and argue that it stands for the proposition that a trial must be limited to the issues that are pled. But in fashioning that rule, the Nebraska Supreme Court noted:

> While we recognize that judicial efficiency might be promoted if courts were to, sua sponte, determine questions raised by the facts but not presented in the pleadings, that efficiency would come at the expense of due process. Hy-Vee argues, in essence, that the district court erred by not deciding an issue of which the parties had no notice, and regarding which they did not have an opportunity to be heard. But see *In re Application No. C-1889,* 264 Neb. 167, 647 N.W.2d 45 (2002) (procedural due process requires that parties whose rights are to be affected are entitled to notice and opportunity to be heard). We conclude that the district court did not err by declining to address an issue that was not pled by the parties or presented to the district court for disposition.

*Spanish Oaks v. Hy-Vee*, 265 Neb. at 149, 655 N.W.2d at 404.

In *Spanish Oaks*, the trial issue was not framed by the parties prior to that trial through the pleadings, pretrial memoranda, or pretrial orders. That is not the case here. Although the issue was not immediately framed by Appellees in their June 2023 response to the court's request to frame issues in anticipation of an October trial, that trial did not take place until January 2025 and was tried to a different judge. And in this case, the issue was framed by Appellees prior to that trial. In addition to numerous other matters that occurred between June 2023 and the January 2025 trial, including a petition to intervene and numerous other pleadings and hearings, the issues framed for the new judge governing the January 2025 trial were set forth in pretrial briefs, and the specific issue was framed by the referees themselves in a proposed amendment to their report issued prior to trial. On this record, we reject Appellees' argument that the issue of the value of Miles and Lee Valley was waived by the Appellees by failing to frame the issue in their June 2023, response to the court as the due process concerns noted in *Spanish Oaks, supra*, are not present here.

Finally, Appellants contend that the district court erred in failing to assign a recreational value of $150,000 to the River Farm unit. Henrichsen testified that River Farm was comprised of approximately 300 acres of Class I soil and approximately 50 acres of Class 3 hodgepodge. He testified that the referees utilized a USDA map to determine the number of tillable acres. Henrichsen testified that the referees assigned a zero value to approximately 51.92 acres alongside the Missouri River because those acres did not have any crop production potential or any recreational potential. Henrichsen testified that the Missouri River and recreation do not correlate and that neither party informed the referees that 51.92 acres of the River Farm unit had been utilized for recreational purposes. Fitzgerald similarly testified that the referees assigned a zero value to the 51.92 acres because

> we are valuing the property in its entirety, 500 acres, primarily farmland. We [were] not looking at just that piece by itself. If there's value there, it erodes the value on the rest of the farm because of access driving through a field, pivot, drainage, other items. If there is

- 13 -

value there, the net is zero, which is why we gave those acres because they're more of a tax burden. And that's why we stood by a zero value on the property overall, not just those 40 acres on their own.

Although Scott testified that individuals have been permitted to hunt, fish, and ride 4-wheelers or ATVs on this portion of the River Farm unit, there was evidence in the record that accessing the 51.92 acres required driving over and destroying crops or required building some type of easement or access. And although Scott asserted that those acres had some recreational value, we note that there was conflicting testimony on the subject, and we defer to the district court's credibility determination in resolving this issue. In an appeal of an equity action, where credible evidence is in conflict on a material question of fact, an appellate court considers and may give weight to the fact that the trial court heard and observed the witnesses and their manner of testifying and accepted one version of the facts rather than another. *FTR Farms v. Rist Farm,* 305 Neb. 708, 942 N.W.2d 204 (2020).

Appellants further assigned that the court erred in refusing to allow Scott to testify as to the value of the River Farm unit as Scott was the owner of the River Farm unit, and that "[h]e testified as to the current use of the recreational portion of River Farm and was therefore qualified to estimate the value of the portion of the land as recreational land, without further foundation." Brief for appellants at 41.

In *Langfeld v. Department of Roads*, 213 Neb. 15, 328 N.W.2d 452 (1982), the Nebraska Supreme Court had occasion to review the competency of an owner of land to testify to its current market value. In doing so, the court explored the proposition of law contained in Appellants' brief that in Nebraska, a "landowner is always qualified to testify as to the value of his or her own property in a condemnation action without further foundation being required." In framing the issue, the Nebraska Supreme Court stated:

> The "ipso facto" rule, as stated above, apparently would permit a person with a limited farm experience, who has no knowledge of the attributes of land necessary for commercial development and no information as to the state of the market as to such type of land, to express an opinion as to value of the land for commercial purposes. Because we believe such conclusion is completely unreasonable, we have chosen to reexamine the logic of the presently existing rule.

*Langfeld v. Department of Roads*, 213 Neb. at 21, 328 N.W.2d at 456. After reviewing extensive authority on the subject, the Nebraska Supreme Court ultimately held:

> We therefore restate the rule to be that an owner who is shown to be familiar with the value of his land shall be qualified to estimate the value of such land for the use to which it is then being put, without additional foundation. Such owner is not qualified by virtue of ownership alone to testify as to its value for other purposes unless such owner possesses, as must any other witness as to value, an acquaintance with the property and is informed as to the state of the market.

*Id.* at 26, 328 N.W.2d 452, 458 (1982).

Although *Langfeld* involved a condemnation proceeding, the rule has subsequently been applied more generically in cases which did not involve condemnation proceedings. See *Nelson v. Metropolitan Utilities Dist.*, 249 Neb. 956, 959, 547 N.W.2d 133, 136 (1996) (holding "whether an owner of property is qualified to testify is decided by an analysis of the owner's familiarity with the property.")

Here, the subject land, the River Farm unit, was fundamentally used and evaluated for agricultural purposes. And although Scott testified that the parties sometimes allowed individuals to hunt, fish, and ride 4-wheelers or ATV's on a portion of the land, the specific issue became whether Scott had sufficient familiarity to testify as to the value of a portion of the River Farm unit for use as recreational ground. In examining Scott's familiarity, he attempted to relate his market expertise to his memory of the sale of a portion of farm ground for recreational purposes, but when asked for specifics, he testified, "I've got the piece in my head and I know where it's at, but I can't explain it and I can't give coordinates or anything like that." More specifically, Scott did not provide any specific comparable sales or adjust for the differing value of the land for agricultural purposes. Cf. *McArthur v. Papio-Missouri River NRD*, 250 Neb. 96, 547 N.W.2d 716 (1996) (holding owner attesting to value for different use laid sufficient foundation for expertise for determining highest and best use and value). On this record, we find no error associated with the trial court's ruling that Scott lacked sufficient foundation to testify to the value of the River Farm unit for recreational purposes.

CONCLUSION

For the reasons set forth herein, we affirm.

AFFIRMED.

- 15 -